Sheldon ROBERTS, Appellant

v.

The STATE of Texas.

No. PD–1054–07.

Court of Criminal Appeals of Texas.

Dec. 17, 2008.

---

Christian T. Souza, Asst. Public Defender, Dallas, for Appellant.

Kim Schaefer, Asst. Criminal District Atty., Dallas, Jeffrey L. Van Horn, State's Atty., Austin, for State.

## OPINION

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, HOLCOMB and COCHRAN, JJ., joined.

Appellant was charged with capital murder by two separate indictments, one alleging the death of a pregnant woman and her embryo and the other alleging the deaths of more than one person. A jury convicted appellant of capital murder under both indictments. Because the state did not seek the death penalty, appellant's sentences were assessed at life imprisonment.[1] Appellant appealed both convictions, and the court of appeals affirmed each with a separate opinion. Appellant sought discretionary review of both decisions of the court of appeals, but we granted review of only the appeal of the conviction for killing a pregnant woman and her embryo. We reform the judgment to reflect a conviction for the murder of Virginia Ramirez and remand to the trial court for sentencing on that charge.

## FACTS

Around midnight on December 19, 2003, multiple assailants invaded a Dallas apartment, firing numerous rounds of gunfire inside and killing three of the occupants of the apartment: Heath Laury, a resident, Jennifer Thompson, a visitor and Laury's girlfriend, in the south bedroom and, in the north bedroom, Virginia Ramirez, a resident who was in the early stages of pregnancy. When the shooting had ended, Ramirez's two-year-old daughter was also in the north bedroom. Royale Bolden, a resident of the apartment and the father of the two-year-old, testified that he and a visitor, Corey Smith, hid in the closet in the north bedroom and escaped harm. Another visitor escaped by jumping out of the window in the south bedroom.

Ms. Ramirez's mother, Elsa Moncayo, testified that her daughter had lived in the apartment with her two children from March of 2003 until her death in December of that year.[2] Emmanuel Rogers, a co-defendant, gave a written statement in which he indicated that the attackers knew the residents of the apartment, and he described a confrontation earlier in the evening at the apartment "where the Mexican girl and Heat[3] stayed," during which "the Mexican girl tried to fight" Brandon Shaw, a co-defendant in the murders.[4]

---

1. In a joint trial, appellant's co-defendant, Brandon Okeith Shaw, was also convicted of capital murder and sentenced to life imprisonment. *Shaw v. State*, No. 11–05–00265–CR and 11–05–00266–CR, 2007 WL 1501028, 2007 Tex.App. LEXIS 3966 (Tex.App.-Eastland, delivered May 24, 2007, no pet. filed)(not designated for publication). Another co-defendant, Emmanuel Dornail Rogers, was tried separately and was also convicted of these murders and sentenced to life imprisonment. *Rogers v. State*, No. 05–05–00283–CR and No. 05–05–00284–CR, 2006 WL 475795, 2006 Tex.App. LEXIS 1609 (Tex.App.-Dallas, delivered March 1, 2006, no pet. filed)(not designated for publication).

2. Ms. Ramirez's two-year-old daughter was present at the time of the attack. Her seven-year-old son was spending the night with his grandmother, Ms. Moncayo. At the time of the trial, Ms. Ramirez's children were living with Ms. Moncayo.

3. Heath Laury was known as "Heat," or "Lil Heat." Testimony from a survivor revealed that Shaw's brother, "Fifty," had been shot and Shaw believed that "Heat" was involved in the shooting.

4. Royale Bolden testified that Shaw and others had barged into the apartment around sundown and had confronted Heat about what he knew about Fifty's shooting. Heat denied knowledge, and Ms. Ramirez had screamed at Shaw and the others to get out of her house.

Detective James Vineyard testified that examination of the north bedroom door showed 4 holes made by bullets, each entering the door at different angles.[5] Detective Vineyard stated that the differing angles of impact indicated that either the door was being closed when the shots were fired or that the door was stationary and the shooter was moving. He also stated, "The position of the body and transferred blood [on the wall behind the door] and in relationship to the door would indicate that she was obviously behind the door. Indication is that she probably was trying to close the door and was turning toward the wall or the inside of the bedroom as she was shot."

The indictment alleged that appellant had intentionally and knowingly caused the death of Ms. Ramirez by shooting her with a firearm, a deadly weapon, and during the same criminal transaction had intentionally and knowingly caused the death of "another individual, to-wit: an unborn child of Virginia Ramirez by shooting Virginia Ramirez while said unborn child was in gestation of said Virginia Ramirez." The jury found appellant guilty of capital murder as alleged in the indictment.

On appeal, appellant raised several points of error including claims that: 1) the evidence was legally and factually insufficient to sustain the conviction; and 2) the trial court erred by submitting an erroneous jury charge that failed to require a culpable mental state for the death of the unborn child, thereby causing egregious harm. The court of appeals overruled both issues and affirmed the trial court's judgment. *Roberts v. State*, No. 06–05–00165–CR, 2007 WL 1702771, 2007 Tex. App. LEXIS 4605 (Tex.App.Texarkana, delivered June 14, 2007)(not designated for publication).

We granted two of appellant's grounds for review, which assert that the court of appeals erred

(1) by holding that the evidence was both legally and factually sufficient to support the jury's verdict;

(2) in holding that the charge did not contain a material variance or lack a required culpable mental state.

In his brief, appellant "rephrases the issues" and questions the sufficiency of the evidence to establish his participation in a capital murder when the state relied upon testimony from two witnesses who were his accomplices in another murder and whose testimony did little more than place him at the scene of the shooting and establish his friendship with one of the shooters. He asserts that, because the evidence merely established his presence at the location of the offense and his friendship with one of the shooters, the evidence was insufficient to support the conviction.

Appellant also questions whether proof that he killed a pregnant woman and her embryo in the same transaction established capital murder when he was unaware of the pregnancy. He notes that the state's medical expert testified that it was impossible for someone to look at Ms. Ramirez's outward appearance at the time of her death and be able to tell that she was pregnant. He argues that, because it was impossible for him to know that she was pregnant, he lacked the specific intent to kill her embryo, which is an element of capital murder as alleged in the indictment.

## SUFFICIENCY OF THE EVIDENCE

The state asserts that this court lacks jurisdiction to review appellant's complaint

---

**5.** A fifth hole was made by a shotgun. No trajectory could be established from that hole. All of Ramirez's injuries were caused by .40 or .45 caliber bullets.

that the evidence does not sufficiently corroborate the testimony of the two witnesses because that claim was never raised in the court of appeals. Alternatively, it argues that the corroboration requirement for accomplice-witness testimony does not apply because these two witnesses were not accomplices in the case being tried, but rather were accomplices in an unrelated murder case.

The court of appeals observed in its opinion that there was a portion of appellant's brief on direct appeal that could be read as raising the issue that accomplice testimony must be corroborated by nonaccomplice testimony. *Roberts v. State, supra* at 2007 WL 1702771, at *8, n. 9, 2007 Tex.App. LEXIS 4605 * 23–24, n. 9. It concluded, however, that if appellant intended to raise such issue, he had failed to provide any substantive analysis of corroboration issues and that, because his brief contained no analysis of the sufficiency of the state's evidence to corroborate accomplice-witness testimony, "any such issues would have been inadequately briefed and would be properly overruled." *Id.*

■ Appellant did not raise, nor did we grant review of, a ground complaining about the testimony of the two named witnesses (Nero and Jackson) who had been co-defendants with appellant in regard to a different murder. We observe that appellant's brief on direct appeal includes a discussion of the testimony of these two witnesses, Nero and Jackson, as simply providing evidence of appellant's mere presence at the scene of the crime, which was not enough to prove guilt. But it made no mention of any challenge to the testimony provided by those two witnesses because of any insufficiency of evidence to corroborate their testimony, nor did it make any argument that corroboration was required. We agree with the court of appeals that, if appellant had been attempting to raise such a complaint about uncorroborated accomplice-witness testimony, it was inadequately briefed and could properly be overruled. Because appellant did not present to the court of appeals his claims about the accomplice-witness rule's applicability to the testimony of these two witnesses and the court of appeals consequently did not rule on that issue, we decline to address that component of appellant's first ground for review. "This Court reviews only 'decisions' of the courts of appeals; we do not reach the merits of any party's contention when it has not been addressed by the lower appellate court." *Sotelo v. State,* 913 S.W.2d 507, 509 (1995).

Appellant also argues that, considering all of the evidence (including the testimony of Nero and Jackson), in the requisite light of "most favorable to the verdict," the evidence is legally insufficient to support the conviction. He asserts that the bullets, even if attributed to him, were not connected to any of the weapons actually used in the offense. He adds that his mere possession of a rifle which was the same type as a rifle used in the offense is not evidence that he was involved in the offense. He also notes that, according to Nero and Jackson, he had denied participating in the shooting and claimed not to have even entered the apartment in which the shooting had taken place.

■ "In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State,* 214 S.W.3d 9, 13 (2007), *citing Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560

(1979). In addressing a claim of factual insufficiency of the evidence, we review all of the evidence in a neutral light. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007); *Garza v. State*, 213 S.W.3d 338, 344 (Tex.Crim. App.2007).

The court of appeals considered the testimony of thirteen witnesses. *Roberts, supra* at 2007 WL 1702771, at *3-*8, 2007 Tex.App. LEXIS 4605 at 12–23. It determined that there was evidence to show, at a minimum, that appellant was with the men who did the shooting, that he helped the shooters break into the apartment, and that he helped conceal and destroy evidence after the fact. *Id.* at *8, 2007 Tex. App. LEXIS 4605 at * 23. It concluded that there was enough direct and circumstantial evidence so that the jury could, at a minimum, link appellant to the commission of these murders as a party. *Id.*

After reviewing the record, we hold that the court of appeals did not err in overruling appellant's general challenges to the legal and factual sufficiency of the evidence. Accordingly, we overrule ground one.

### CULPABLE MENTAL STATE

Ground two challenges the court of appeals' holding regarding appellant's claim that the jury charge contained a material variance or lacked a required culpable mental state. As noted above, upon briefing appellant "rephrases the issues." "Issue Number Two" of appellant's brief now states, "Whether proof that Appellant killed a pregnant woman and her embryo in the same transaction established capital murder when Appellant was unaware of the pregnancy." Appellant points out that the indictment charged him with killing a pregnant woman with specific intent to kill her embryo in the same transaction. He argues that "[b]ecause specific intent is required to kill the embryo, above and beyond intent to kill the embryo's mother, the 'doctrine of transferred intent' cannot be used to re-assign a defendant's intent to kill an embryo's mother to her embryo."

Alternatively, appellant argues that the court of appeals erred when it failed to find egregious harm from the lack of an instruction in the jury charge that required the jury to find that he specifically intended to kill the embryo. He asserts that "[t]he error is egregious because the charge omitted the capital element; there is no suggestion in the definitional portions of the jury charge or application paragraph that the State must prove Appellant's specific intent to kill [the] embryo."[6]

The court of appeals acknowledged, and appellant and the state agree, that there is no evidence in the record that appellant or anyone else knew that Ms. Ramirez was pregnant at the time of her death. *Roberts, supra* at *9, 2007 Tex.App. LEXIS 4605 at * 26. The evidence showed that Ms. Ramirez was in the early stages of pregnancy. The state's medical expert explained that the pregnancy would have been impossible to perceive from mere ob-

---

**6.** The application paragraph states as follows: Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that on or about December 19, 2003, in Dallas County, Texas, the defendant, acting alone or as a party as defined herein, intentionally or knowingly caused the death of Virginia Ramirez, an individual, by shooting Virginia Ramirez with a firearm, a deadly weapon, and during the same criminal transaction, while desiring or contemplating the death of Virginia Ramirez, did cause the death of Virginia Ramirez's unborn child, an individual, while said unborn child was in gestation of said Virginia Ramirez, you will find the defendant guilty of the offense of capital murder and so say by your verdict.

servation of Ms. Ramirez; "You couldn't tell just by looking at her . . . that she was pregnant." [7] The state asserts that the evidence is legally sufficient to show that appellant possessed intent or knowledge with respect to the embryo because, at the time she was shot, the mother cried out, "Not my baby, not my baby," through the closed door. The state also argues that the trial court properly charged the jury on the doctrine of transferred intent, and that applying that doctrine to the unintended victim in a multiple murder gives proper effect to the legislature's intent to increase the offense to capital murder when two or more victims are killed.

We observe that appellant's brief in the court of appeals included claims that the evidence was legally and factually insufficient to sustain the conviction because of a material variance between the indictment and the proof, and that the trial court erred by submitting an erroneous jury charge that failed to require a culpable mental state for the death of an unborn child, thereby causing egregious harm to appellant. The jury charge included, without objection, language from TEX. PENAL CODE § 6.04(b)(2) stating that "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that a different person was injured, harmed, or otherwise affected."

Appellant correctly asserts that the killing of the second person must be "intentional or knowing." The statutory definitions of intentional or knowing culpability with respect to the result of conduct, as correctly reflected in the jury charge, require the defendant to have the conscious objective or desire to cause the result, or

to be aware that his conduct is reasonably certain to cause the result.

In *Lawrence v. State,* 240 S.W.3d 912, 914–15 (Tex.Crim.App.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2056, 170 L.Ed.2d 798 (2008), the defendant was accused of killing an embryo by fatally shooting the embryo's mother, a woman he had been dating. The defendant was two-timing the mother, and upon learning that the mother was pregnant by him, he told the second girlfriend that he would "take care of" the problem, i.e., the pregnancy. The evidence reflected that the defendant killed the mother with the knowledge that she was pregnant and with the specific intent to kill the embryo. We held, based upon the relevant Penal Code statutes, that a person who "intentionally or knowingly" causes the death of a woman and "intentionally or knowingly" causes the death of her unborn child, at any stage of gestation, commits capital murder, and that the plain language of the statutes prohibits the "intentional or knowing" killing of any unborn human, regardless of age. *Id.* at 915.

The state argues that, when measured against a hypothetically correct jury charge, the evidence is legally sufficient to prove appellant's intent or knowledge with respect to the unborn child. It specifically argues that testimony that the pregnant victim exclaimed, "Not my baby, not my baby," while seeking shelter behind a closed door, provided sufficient evidence by which a reasonable juror could conclude that the shooters knew they were shooting at a pregnant woman and her unborn baby on the other side of the door.

■ "Murder is a 'result of conduct' offense, which requires that the culpable mental state relate to the result of the

---

7. At the time of her death, Ms. Ramirez was 5′3″ tall and weighed 229 pounds. The medi-

cal examiner estimated that she was 8–9 weeks pregnant.

conduct, i.e., the causing of the death." *Schroeder v. State,* 123 S.W.3d 398, 400 (Tex.Crim.App.2003), *citing Cook v. State,* 884 S.W.2d 485, 491 (Tex.Crim.App.1994). In this case, a witness testified that, while he was in a closet hiding from the assailants, he heard Ms. Ramirez scream, "Not my baby. Not my baby," right before she was shot through the bedroom door. But his testimony also established that Ms. Ramirez's two-year-old daughter was with her at the time she was shot. Coming out of the closet after the shooting ended, the witness found Ms. Ramirez with the two-year-old "[o]n her stomach, on her chest"; thus, it is reasonable to infer that the "my baby" to whom the pregnant victim was referring during the shooting was the two-year-old rather than the embryo.

■ In the instant indictment, appellant was charged with capital murder by causing the death of two individuals, Ms. Ramirez and her unborn child while in gestation, during the same criminal transaction. Capital murder is a result-of-conduct oriented offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e. the death of the named decedent. *Kinnamon v. State,* 791 S.W.2d 84, 88–89 (1990), *overruled on other grounds, Cook v. State,* 884 S.W.2d 485, 491 (Tex.Crim.App.1994). Due process requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the offense alleged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In this case, the state alleged that appellant intentionally and knowingly caused the death of Ms. Ramirez's unborn child; thus the state was required to prove beyond a reasonable doubt that appellant possessed that culpable mental state with respect to the death of the unborn child, regardless of any intent to kill Ms. Ramirez.

The state argues that transferred intent applies as to the death of the embryo under the precedent of *Norris v. State,* 902 S.W.2d 428 (Tex.Crim.App.1995). Norris broke into his girlfriend's bedroom through the window and killed her and her two-year-old son (the baby) with multiple shots from a rifle. The baby suffered five gunshot wounds and died instantly. The mother suffered three gunshot wounds and numerous wounds from fragments of bullets that first hit the baby; she died later that night in a hospital. The medical examiner testified, in response to the state's hypothetical, that their wounds were consistent with a bullet fired through the bedroom window that wounded the baby's leg, then fragmented and wounded the mother; thereafter, the mother picked up the wounded baby and held it to her chest, and additional bullets injured one or both of the victims.

The testimony supported the state's theory that Norris shot and wounded the baby from outside, climbed through the broken window, fired again and struck the baby in the forehead, with fragments injuring the mother's face and neck, left the bedroom for a period of time, then returned, fired additional bullets into the victims, then left the apartment in full view of the mother's older sons. The issue of transferred intent was raised only by Norris's own testimony, in which he asserted that he intended to kill only the mother.

The jury charge permitted the jury to find Norris guilty of capital murder "if it found appellant intentionally caused the death of the mother by shooting her with a firearm and during the same criminal transaction either intentionally caused the death of the baby by shooting him with a firearm, *or intended to cause the death of the mother by shooting her with a firearm, and caused the death of the baby by shooting him with a firearm and the only dif-*

ference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured." *Norris*, 902 S.W.2d at 436 (italics in original).

On appeal, Norris asserted that the evidence was insufficient to prove that he specifically intended to cause the death of the baby. The Court found that the jury could have rationally found specific intent; the baby "was in full view of appellant, and appellant admitted seeing him." *Id.*

Norris also asserted that a portion of the jury instruction (in italics above) permitted the jury to convict him under the impermissible application of transferred intent, as set out in TEX. PENAL CODE § 6.04(b)(2). The state argued that "there was no danger the jury convicted appellant of capital murder based on the transferred intent instruction because the jury found at the punishment phase in special issue one that 'appellant deliberately caused the death' of the baby." The jury instruction on the first special issue asked whether Norris caused the death of the baby deliberately and with the reasonable expectation that the death of the baby *or another* would result. *Id.* at 437.

The *Norris* Court acknowledged that capital murder pursuant TEX. PENAL CODE § 19.03(a)(6)(A) requires two or more intentional or knowing murders. Its analysis of the application of § 6.04(b)(2) to § 19.03(a)(6)(A) is one short paragraph.

The plain language of Section 6.04(b)(2) evinces a legislative policy to make a defendant, who, like appellant, acts with the specific intent to kill, criminally responsible for the consequences of his voluntary acts. And, this Court has held Section 6.04(b)(2) can be applied to establish a Section 19.02(a)(1) murder.

See *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Crim.App.1982)(op. on reh'g). Therefore, since Section 19.03(a)(6)(A) [8] incorporates two or more Section 19.02(a)(1) murders and Section 6.04(b)(2) can be used to establish a Section 19.02(a)(1) [9] murder, and in light of the legislative policy underlying Section 6.04(b)(2) and the statutory first special issue, we hold Section 6.04(a)(2) applies to a Section 19.03(a)(6)(A) capital murder prosecution.

*Id.* at 437–38.

This conclusion is at odds with the *Norris* Court's recognition that, for capital murder pursuant to Section 19.03(a)(6)(A), each death must be intentional or knowing—there must be a discrete "specific intent to kill" as to each death. A classic example of proper application of transferred intent is the act of firing at an intended victim while that person is in a group of other persons. If the intended person is killed, the offense is murder. If a different person in the group is killed, the offense is murder pursuant to TEX. PENAL CODE § 6.04(b)(2): "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: a *different* person or property was injured, harmed, or otherwise affected." (Emphasis added.) In either case, there was one intent to kill and one resulting death.

 If both persons are killed, we cannot use transferred intent to charge capital murder based on the death of the unintended victim, as that would require using a single intent to kill to support the requirement of two intentional and knowing deaths. Further, while § 6.04 permits the use of transferred intent if a *different* per-

---

8. Now § 19.03(a)(7)(A).

9. Now § 19.02(b)(1).

son in harmed;[10] such use is not authorized if the intended victim is also killed, as that would permit one intent to kill to support more than one death.[11] This is the fallacy of *Norris;* it permits the intent to cause one intentional or knowing death to support two deaths, one intentional and knowing, the other unintentional. We overrule *Norris* to the extent that it allows such use. Transferred intent may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction only if there is proof of intent to kill the same number of persons who actually died, e.g., with intent to kill both Joe and Bob, the defendant killed Joe and Lou. It may also be used if, intending to kill both Joe and Bob and being a bad shot, the defendant killed Mary and Jane. This resolution comports with *Aguirre v. State,* 732 S.W.2d 320 (Tex. Crim.App.1982), but does not violate the plain language of § 6.04(b)(2) or § 19.03(a)(7).

■ But that is not the case here. Appellant intended to kill A, and did so. If he is to be charged with also intentionally and knowingly killing a second person, in this case the embryo, by killing the mother, there must be a separate specific intent to do so. *See Lawrence, supra* (shot pregnant girlfriend with specific intent to kill the embryo). It is undisputed that appellant did not know that Ms. Ramirez was pregnant. Lacking knowledge of the embryo's existence, appellant could not form a separate specific intent to kill the embryo, as is required by statute.[12]

Nor can we say that intent to kill the two-year-old, even if such an intent had been proved, could transfer to the embryo under these facts.[13] Transferred intent in this context is based on the principle that an act intended to kill one person instead killed another. If, with intent to kill the two-year-old, appellant had fired a bullet that entered Ms. Ramirez's uterus and killed the embryo, transferred intent may lie. But that is not the case here. The embryo was not viable outside of a living uterus and died because its mother died. No act of appellant toward the two-year-old resulted in the death of the embryo.

We cannot conclude that there was sufficient evidence of the constitutionally required proof beyond a reasonable doubt that appellant intentionally and knowingly

10. Had Ms. Ramirez's two-year-old daughter died during the course of this attack instead of her mother, appellant would have been criminally responsible for her death pursuant to the application of the doctrine of transferred intent through § 19.02(b)(2, 3). He would also be vulnerable to a separate charge of capital murder for causing the death of a child under the age of six years. TEX. PENAL CODE § 19.03(a)(8).

11. The second death could be charged as murder pursuant to § 19.02(b)(2) (intends to cause serious bodily injury and commits an act clearly dangerous to human life) or § 19.02(b)(3) (commits or attempts to commit a felony, other than manslaughter, and in the course of ... the commission or attempt, commits an act clearly dangerous to human life), but not as murder pursuant to § 19.02(b)(1), because that section requires a separate and specific intent to kill. It therefore cannot be used support *capital* murder, which requires a intentional and knowing murder for each victim.

12. Appellant was, however, vulnerable to a charge of murder for his intent to kill Ms. Ramirez and a charge of capital murder for the death of Ms. Ramirez in the course of the murders of the other occupants of the apartment or of the burglary of the apartment.

13. Based on the evidence, the attackers knew the residents of the apartment and would have been aware that two children lived there. The two-year-old was in the bedroom with her mother and was unharmed, even though she was a known, easy, and available target.

caused the death of Ms. Ramirez's unborn child. We sustain appellant's ground two.

We reverse the judgment of the court of appeals and reform the judgment to reflect a conviction for the murder of Virginia Ramirez and remand to the trial court for assessment of punishment for that murder conviction.[14]

PRICE, J., filed a concurring opinion in which WOMACK, J., joined.

KELLER, P.J., filed a dissenting opinion.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER, J., joined.

PRICE, J., filed a concurring opinion in which WOMACK, J., joined.

In *Lawrence v. State*,[1] we made it clear that, in order to obtain a conviction under the multiple-victims theory of capital murder where the victims are a mother and her unborn child, a defendant must have specifically intended to cause the deaths of both mother and child. We said:

Under the Texas Penal Code, a person commits capital murder if he intentionally or knowingly causes the death of "more than one person ... during the same transaction." A "person" includes an "individual." The Penal Code in turn defines an "individual" as "a human being who is alive, including an unborn child at every stage of gestation from fertilization to birth." It follows from these provisions that a person who intentionally or knowingly causes the death of a woman *and her unborn child*, at any stage of gestation, commits capital murder.[2]

The question before us in this case is whether it is legally permissible to say that the appellant intentionally or knowingly killed Ramirez's gestating baby when, so far as the evidence reveals, he had no knowledge that she was even pregnant.

In *Norris v. State*,[3] the Court expressly held that the statutory doctrine of transferred intent may be applied to obtain a conviction under the multiple-victims theory of capital murder.[4] Presumably this means that the State was entitled to rely upon Section 6.04(b)(2) of the Penal Code

**14.** We did not grant review of appellant's conviction and life sentence for capital murder in the companion case, and that judgment remains undisturbed. *See* footnote 1, *supra*.

**1.** 240 S.W.3d 912 (Tex.Crim.App.2007).

**2.** *Id.* at 915 (footnotes omitted). *See* TEX. PENAL CODE §§ 1.07(a)(26), 1.07(a)(38), 19.02(b)(1) and 19.03(a)(7)(A).

**3.** 902 S.W.2d 428 (Tex.Crim.App.1995).

**4.** Immediately after acknowledging that the multiple-victim theory of capital murder requires proof of "two or more intentional or knowing murders[,]" the Court in *Norris* continued:

The plain language of Section 6.04(b)(2) [of the Penal Code—our transferred intent provision] evinces a legislative policy to make a defendant, who, like appellant, acts with spe-

cific intent to kill, criminally responsible for the consequences of his voluntary acts. And, this Court has held Section 6.04(b)(2) can be applied to establish a Section 19.02(a)(1) [now 19.02(b)(1)] murder. See *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Crim.App. 1982) (op. on reh'g). Therefore, since Section 19.03(a)(6)(A) [now Section 19.03(a)(7)(A)] incorporates two or more Section 19.02(a)(1) murders and Section 6.04(b)(2) can be used to establish a Section 19.02(a)(1) murder, ... we hold Section 6.04(b)(2) applies to a Section 19.03(a)(6)(A) capital murder prosecution.

*Id.* at 437–8. In essence, the Court thus opened the door to allow the State to apply the law of transferred intent to extract two murders from a single act that caused the death of both the intended victim and an unintended victim, and thereby sustain a conviction for capital murder under the multiple-victims theory of that offense.

to convict the appellant in this case.[5] Section 6.04(b)(2) reads:

> A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that ... a different person ... was injured, harmed, or otherwise affected.[6]

Nothing in the plain language of this provision requires the State to prove that the appellant was *aware of* or even *knew of the existence of* the "different person" whose injury he may inadvertently have caused while intending to injure someone else. He may be prosecuted under a theory of transferred intent whether he knew of the existence of the person he actually harmed or not, so long as he had the requisite intent to harm *someone*. Having intended to cause the death of Ramirez, consistent with our holding in *Norris*, the appellant can be found liable for murder for having caused the death or her unborn child, regardless of whether he was aware that the child even existed. Liable in this way for both the murder of Ramirez *and* the murder of her unborn child, the appellant can be found guilty of multiple-victims capital murder—again, at least under our express holding in *Norris*.

I do not agree that a defendant who intentionally or knowingly causes the death of his intended victim should also be liable for the murder of another victim whom, by the same act, he also killed, albeit inadvertently. I do not think that the plain language of Section 6.04(b)(2) accommodates the double use of a single specific intent to elevate two homicidal results, flowing from a single act, to the level of full-blown murder.[7] Accordingly, I would likely have joined that part of Judge Clinton's concurring opinion in which he said:

> Where the meaning of a statutory provision is plain on its face, we are obliged to effectuate that meaning unless to do so leads to absurd results. *Boykin v. State*, 818 S.W.2d 782, at 785 (Tex.Cr. App.1991). On its face § 6.04(b) applies only when there is a "difference between what actually occurred and what [the accused] desired, contemplated or risked[.]" It deems an accused "criminally responsible" to a level commensurate with the offense he "desired, contemplated or risked" whenever "the only difference between" that offense and "what actually occurred" is that "a different offense was committed" or "a different person or property was injured, harmed, or otherwise affected." Section 6.04(b) does *not* provide, however, that if "what actually occurred" was *both* the offense "desired, contemplated, or risked" *and an additional* offense that was not specifically intended, then the State may prosecute the accused for the unintended offense at the same level of criminal responsibility at which it will *also* prosecute him for "the desired, contemplated or risked" offense. The provision does not speak of "additional" offenses, but of "different" ones.

---

5. TEX. PENAL CODE § 6.04(b)(2).

6. *Id.*

7. When an actor intentionally causes the death of his intended victim and, by the same act, recklessly or negligently causes the death of another, unintended victim, then as far as I am concerned he may be prosecuted both for the murder of his intended victim and the

manslaughter or negligent homicide of his unintended victim. TEXAS PENAL CODE §§ 19.04 and 19.05. But, for reasons given in the text immediately *post*, I do not believe a plain reading of the transferred intent statute allows for the actor's prosecution for two full-blown *murders* under Section 19.02(b)(1) of the Penal Code, much less for capital murder under Section 19.03(a)(7)(A).

Nor does this plain reading of § 6.04(b) reap absurd results. The Legislature may well have intended that in a multiple homicide situation, where the killer only intentionally or knowingly caused the death of one of his victims, the killer should be prosecuted dually for murder and some other lesser homicide, but not for capital murder. Surely it is not hard to credit a legislative judgment that such a scenario does not call for the most extreme remedy at its disposal.[8]

For these reasons I disagree with the Court's holding in *Norris.*

To my way of thinking, the *Norris* holding was "poorly reasoned" and "flawed from the outset."[9] True, "[t]he interests underlying the doctrine of *stare decisis* are at their height for judicial interpretations of legislative enactments upon which parties rely for guidance in attempting to conform to those legislative enactments."[10] However, my research does not reveal a single case, from the time we first decided *Norris* in 1995 to the present, in which the State has ever invoked *Norris* to uphold an otherwise unsustainable murder conviction, much less a capital murder conviction. I perceive no reliance interest weighty enough as to justify a conclusion that rote consistency should overcome right interpretation.[11] I therefore vote to overrule *Norris.*

With these additional observations, I join the Court's opinion.

KELLER, P.J., filed a dissenting opinion.

From a sufficiency of the evidence perspective, the correct question is not whether appellant's culpable mental state with respect to Virginia Ramirez can be transferred to her unborn child; the correct question is whether appellant's culpable mental state with respect to *anyone* can be transferred to Ramirez's unborn child. The answer to the latter question is "yes" because appellant's culpable mental state can be transferred to the unborn child from two-year-old Patricia.

Though inartfully phrased and argued, the pro se appellant's third ground for review appears to contain two complaints: (1) about the use of a transferred intent instruction in the jury charge and (2) about the legal sufficiency of the evidence under a transferred intent theory. Appointed counsel and the Court have chosen to focus on the legal sufficiency complaint, but both fail to sufficiently appreciate a complication created by legal sufficiency law with respect to the transferred intent question. The jury charge in this case contained an abstract instruction explaining the law of transferred intent. The application portion of the charge authorized the jury to transfer appellant's culpable mental state from

---

**8.** *Norris v. State, supra* at 450–51 (Clinton, J., concurring).

**9.** *See, e.g., Paulson v. State,* 28 S.W.3d 570, 571–72 (Tex.Crim.App.2000) ("if we conclude that one of our previous decisions was poorly reasoned or is unworkable, we do not achieve [the] goals [of *stare decisis* ] by continuing to follow it"); *Hammock v. State,* 46 S.W.3d 889, 893 (Tex.Crim.App.2001) (one factor favoring overruling precedent is "when the original rule of law is flawed from the outset").

**10.** *Busby v. State,* 990 S.W.2d 263, 267 (Tex. Crim.App.1999).

**11.** *See id.* ("The doctrine of *stare decisis* indicates a preference for maintaining consistency even if a particular precedent is wrong.") I regard this "preference" as a rebuttable presumption. *See State v. Colyandro,* 233 S.W.3d 870, 886–87 (Tex.Crim.App.2007) (Price, J., concurring).

Ramirez to her unborn child while also using that same culpable mental state for Ramirez's own death. If the complaint we are addressing were one of jury charge error, then the question would be the continuing vitality of the holding in *Norris v. State*,[1] which would permit the prosecution to use this single culpable mental state for both of these purposes.[2]

But in a legal sufficiency review, we focus not on the charge that was actually given, but on "the elements of the offense as defined by the hypothetically correct jury charge for the case."[3] The hypothetically correct jury charge includes general criminal liability elements that need not be pled in the indictment, such as the law of transferred intent.[4] Though there is a potential problem with considering a non-indictment theory of liability that is completely absent from the jury charge, any theory that is encompassed at least by the abstract portion of the charge must be considered in a sufficiency review, even if it is not contained in the application paragraph.[5] Tracking the relevant language of the transferred intent statute, the abstract portion of the jury charge in this case provided, "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that a different person was injured, harmed, or otherwise affected."[6] The identity of the actual victim (the culpable-mental-state transferee) is required

for notice and must named in the indictment, but the "desired, contemplated, or risked" victim (the culpable-mental-state transferor) can be any person—including, in this case, Patricia, Ramirez's two-year-old daughter who survived the incident. Of course, the evidence must still be sufficient to show that appellant possessed the required culpable mental state with respect to Patricia, and to that question I now turn.

Eight individuals (as defined by law)[7] were in the apartment before the assailants entered. Heath Laury, Jessica Thompson, and Bradlee Bowie were in the living room. Royale Bolden and Corey Smith were in the front bedroom. Ramirez (pregnant with her unborn child) and two-year-old Patricia were in the back bedroom. Each bedroom had a door that opened out into the living area. After the assailants entered the apartment, Bowie fled to the back bedroom because he knew there would be an open window. Before exiting through that window, he noticed that Ramirez and Patricia were in the room. Bowie then ran home and had no further knowledge of what happened in the apartment. No one, other than the assailants, witnessed Laury and Thompson's movements in the house during the encounter, but their bodies were later discovered in the back bedroom, so an inference could be drawn that they fled there. In the front bedroom, Bolden and Smith hid

---

1. 902 S.W.2d 428 (Tex.Crim.App.1995).

2. *See id.*

3. *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim.App.1997).

4. *Id.* at 239–40.

5. *See Vega v. State,* 267 S.W.3d 912 (2008)("it is irrelevant in a sufficiency review that the application paragraph of the charge actually

given erroneously applied only the law of parties under § 7.02(a)(2)"); *Grissam v. State,* 267 S.W.3d 39 (Tex.Crim.App.2008)(sufficiency of the evidence analysis as to both theories of burglary should have been conducted where both were contained in the jury charge, though only one was in the application paragraph).

6. *See* TEX. PENAL CODE § 6.04(b).

7. *See id.,* § 1.07(a)(26).

in the closet. They heard gunshots during the entire encounter. Bolden heard Ramirez enter the front bedroom and scream, "Not my baby. Not my baby," followed by the last two shots. After the assailants left, Bolden left the closet and saw Ramirez lying on the floor, dead, with Patricia lying on her chest and in her arms. According to testimony based upon forensic evidence, Ramirez was behind the bedroom door, probably trying to close it, and turning away from it, when she was shot. Five bullet holes were found in the door and three bullet wounds were found in Ramirez's body. Ramirez suffered wounds to the head, the right shoulder, and the left posterior lateral thigh. Miraculously, though she was shaken and upset, Patricia was physically unharmed.

A jury could have rationally believed that Ramirez and Patricia were together at all times, and that in fact, Ramirez carried Patricia from the back bedroom to the front bedroom in an attempt to escape their attackers. A jury could likewise rationally believe that the assailants saw both Ramirez and Patricia in the back bedroom or in the living area leading to the front bedroom, and the jury could further believe that the assailants pursued mother and child and shot at them both as Ramirez was closing the door. Ramirez's scream, "Not my baby," referred most obviously to her two-year-old child and indicated Ramirez's own belief that the assailants were attacking, or at least endangering, not only herself, but Patricia as well. That the assailants continued to

fire after hearing Ramirez scream a reference to her child further indicates that they either intended to kill the child along with Ramirez, or they were reasonably certain[8] their actions would cause that result and they simply did not care.

Because the evidence was sufficient to show that the assailants possessed a required culpable mental state with respect to Patricia, that culpable mental state could transfer from Patricia, who survived, to the unborn child, who did not. We need not address the continuing vitality of *Norris* to resolve the evidentiary sufficiency claim.

With these comments, I respectfully dissent.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER J., joined.

The issue in this case has become whether "transferred intent" principles, codified in Section 6.04(b)(2), TEX. PEN. CODE, apply in a multiple-victim capital-murder prosecution[1] when the defendant murders his intended victim and an unintended victim (in this case a mother and her unborn child). Over thirteen years ago, this Court in a six-judge majority opinion settled this issue in more than "one short paragraph"[2] and construed Section 6.04(b)(2) to permit the application of "transferred intent" principles in such a case. *See Norris v. State*, 902 S.W.2d 428, 436–39 (Tex.Cr.App.1995) (McCormick, P.J., joined by White, Overstreet, Meyers,

---

8. "Knowledge" is a sufficient culpable mental state for capital murder involving the murder of more than one person. *See id.,* §§ 19.03(a)(7)("murders more than one person"), 19.02(b)(1)("intentionally or *knowingly* causes the death of an individual")(emphasis added), 6.03(b)("knowingly" defined as "aware that ... conduct is reasonably certain" to cause a prohibited result).

1. *See* § 19.03(a)(7)(A), TEX. PEN.CODE, (person commits capital murder if person intentionally or knowingly murders more than one person during the same criminal transaction).

2. *But see* Maj. op. at 330 (erroneously claiming that analysis of transferred intent issue in *Norris*.is "one short paragraph").

Mansfield and Keller, JJ.).[3] Saying now that this six-judge majority opinion was incorrectly reasoned, the Court overrules it and adopts much of the reasoning of Judge Clinton's one-judge concurring opinion in *Norris*.[4] *See* Maj. op. at 331 (the "fallacy of *Norris*" is that "it permits the intent to cause one intentional or knowing death to support two deaths, one intentional and knowing, the other unintentional").

The holding in the majority opinion in *Norris* was based on the language of Section 6.04(b)(2) and it also relied on the "anomalous" results of Judge Clinton's construction of Section 6.04(b)(2), at least as it applied to a multiple-victim capital-murder prosecution. The majority opinion in *Norris* noted that under Judge Clinton's concurring opinion in *Norris:*

> [T]he result would be that a defendant, who intentionally murders his spouse and "accidentally" kills several bystanders, could *not* be prosecuted for capital murder because he murdered his intended victim. However, a defendant who with the intent to murder his spouse fails to murder his spouse but "acciden-

tally" kills several bystanders could be prosecuted for capital murder, even though he killed less people than in the above hypothetical for which he could not be prosecuted for capital murder. The Legislature did not intend such anomalous results when it enacted [the statute making it capital murder to murder more than one person during the same criminal transaction].

*See Norris,* 902 S.W.2d at 438 (emphasis in original).[5]

A consideration of the consequences of a particular construction of a statute is an accepted, and not a flawed or fallacious, method of statutory construction. *See Norris,* 902 S.W.2d at 438 (in construing a statute, court may consider consequences of a particular construction whether or not the statute is considered ambiguous); § 311.021(3), TEX. GOV'T CODE, (in enacting a statute, it is presumed that Legislature intended a just and reasonable result); § 311.023(5), TEX. GOV'T CODE, (in construing a statute, a court may consider consequences of a particular construction); *see also Boykin v. State,* 818 S.W.2d 782, 785

---

3. Two of the judges participating in the decision in *Norris* did not vote on the merits of the "transferred intent" issue. *See Norris,* 902 S.W.2d at 448 (Maloney, J., concurring in the result) and at 451–52 (Baird, J., concurring only in the judgment). Thus, six out of the seven judges, who considered the merits of this issue in *Norris,* decided that transferred intent principles apply in cases like this.

4. *See Norris,* 902 S.W.2d at 448–51 (Clinton, J., concurring only in result) (noting that majority's holding on "transferred intent" issue was "entirely necessary to the majority's disposition of the appeal" and stating that "transferred intent" principles in Section 6.04(b)(2) should not apply when defendant in a single act kills intended victim and an unintended victim).

5. It should also be noted that each of these hypothetical defendants in *Norris* has the same culpable mental state (each having the intent to murder their spouse). This should

be considered significant because the usual rationale (and the one essentially relied upon in the Court's opinion in this case) for not applying "transferred intent" principles when a defendant murders his intended victim and an unintended victim is that it is "simply unjust" to treat this defendant as "equally culpable" with the defendant "who commits two acts intending to kill two people." *See* Elizabeth F. Harris, *The Maryland Survey: 1995–1996: Recent Decisions: The Maryland Court of Appeals* 56 Md. L.Rev. 744, 758–60 (1997). This rationale is debatable (as, for example, the unintended dead victim, as well as individual legislators debating the issue, might quite reasonably consider both of these hypothetical defendants equally culpable). In any event, this debatable rationale does not apply to the hypothetical defendants in *Norris* since each is equally culpable (each having the intent to murder their spouse).

(Tex.Cr.App.1991) (court will not follow plain meaning of a statute if doing so would lead to "absurd" consequences that Legislature could not have intended). And the construction of Section 6.04(b)(2) in Judge Clinton's concurring opinion in *Norris* would have allowed the "anomalous" results discussed in *Norris,* since Judge Clinton's concurring opinion would have supported a decision that "transferred intent" principles in Section 6.04(b)(2) would permit the murderous intent of the hypothetical defendant, who fails to murder his intended victim, to be transferred to **all** of the innocent bystanders.[6]

This would be consistent with the plain language of Section 6.04(b)(2) since each innocent bystander is a "different person" under Section 6.04(b)(2). *See Norris,* 902 S.W.2d at 450–51 (Clinton, J., concurring only in result) (court should follow plain language of Section 6.04(b)(2)); *see also* § 6.04(b)(2) (person is criminally responsible "for causing a result if the only difference between what actually occurred and what he desired" is that a "different person" was harmed); § 311.012(b), TEX. GOV'T CODE, (singular in a statute includes the plural and the plural includes the singular). Under Judge Clinton's concurring opinion in *Norris,* the hypothetical defendant who murdered less people would be

subject to the death penalty while the hypothetical defendant who murdered more people would not. It cannot fairly be said that the majority opinion in *Norris* was erroneously reasoned for rejecting this construction of Section 6.04(b)(2).[7]

It is also relevant that the majority opinion in *Norris* finds support from other out-of-state courts that have decided that "transferred intent" principles apply when a defendant murders both his intended victim and an unintended victim even in a case like this involving a murdered woman and her unborn child. *See Pennsylvania v. Sampson,* 900 A.2d 887, 889 (Pa.Super.Ct.2006) (defendant responsible for murders of mother and unborn child under Pennsylvania statute similar to Section 6.04(b)(2)); *People v. Carlson,* 37 Cal. App.3d 349, 112 Cal.Rptr. 321, 326 (1974) (doctrine of transferred intent applies even though the original object of the assault is killed as well as the person whose death was the unintended result; therefore, "in the present case in the application of the doctrine of transferred intent, the law would transfer defendant's felonious intent to kill his [murdered] wife to the fetus and the criminality of defendant's act toward the fetus would be the same as that directed to his wife"); *see also Norris,* 902

---

**6.** Judge Clinton's concurring opinion in *Norris* did not claim otherwise.

**7.** The Court's opinion in this case is inconsistent with Judge Clinton's concurring opinion in *Norris* by misconstruing the plain language of the "different person" element of Section 6.04(b)(2) by stating that transferred intent "may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction **only** if there is proof of intent to kill the same number of persons who actually died." *See* Maj. op. at 14 (emphasis added). Section 6.04(b)(2), *however, plainly does not state* that transferred intent may be used "only if there is proof of intent to kill the same number of

persons who actually died." And, even if this is what Section 6.04(b)(2) stated, then the judgment of the court of appeals in this case should be affirmed since there is, as Presiding Judge Keller's dissenting opinion points out, evidence that appellant intended to kill at least "the same number of persons who actually died." The Court's opinion criticizes the majority opinion in *Norris* for not following the plain language of Section 6.04(b)(2) but then fails to give effect to the plain language of the "different person" element of that statute. *But see Norris,* 902 S.W.2d at 450–51 (Clinton, J., concurring only in result) (court should follow plain language of Section 6.04(b)(2)).

S.W.2d at 438 (noting split of California authorities on the issue).[8] It is thus clear that reasonable minds can differ on the "transferred intent" issue that the majority opinion in *Norris* settled even under statutes similar to Section 6.04(b)(2).

It, therefore, cannot fairly be said that the Court should disregard the rule of *stare decisis* and overrule *Norris* on the basis that *Norris* was erroneously reasoned or "flawed from the outset." *See State v. Medrano*, 67 S.W.3d 892, 901–03 (Tex.Cr.App.2002) (Cochran, J., joined by Keller, P.J., and Keasler, Hervey, and Holcomb, JJ.) (a reason for disregarding the rule of *stare decisis* is that the previous decision was flawed from the outset). It is also significant that the Legislature has not changed the construction of Section 6.04(b)(2) by *Norris* during the more than thirteen years since *Norris* was decided. *See Medrano*, 67 S.W.3d at 902 (legislative

silence after a statute has been construed is some evidence that the legislature intended "the same construction should continue to be applied to that statute").[9] And the Legislature could easily have done this without reenacting Section 6.04(b)(2) in the same terms but with the additional phrase, "we really mean it." *See Medrano*, 67 S.W.3d at 907–08 (Womack, J., dissenting, joined by Price, J.) (if judicially construed statute "could easily be set right by clarifying language, the legislative choice not to do so" might be more significant than when a clearly stated and unambiguous statute is judicially misconstrued leaving Legislature with little choice but to reenact the statute in the same terms but with the additional phrase, "we really mean it").

This case seems to meet all of the criteria, approved by the eight members of this Court who participated in the decision in *Medrano*, for following the rule of *stare*

---

**8.** *See also People v. Lovett*, 90 Mich.App. 169, 283 N.W.2d 357 (1979) (in cases like this, there are as many crimes as there are victims); *Ford v. State*, 330 Md. 682, 625 A.2d 984, 1004–05 (1993) (McAuliffe.J., concurring) (and cases cited particularly a 1992 unpublished decision by the Delaware Supreme Court in *Robinson v. State* 1992 Del. LEXIS 506 (Del.1992) construing a Delaware statute very similar to Section 6.04(b)(2) and federal court decisions applying "the principle of transferred intent in cases where the intended victim is killed by the same act that kills the unintended victim"); *Harris, supra*.

**9.** The Court's opinion does not address the Legislature's failure to change the construction of Section 6.04(b)(2) by the majority opinion in *Norris*. The author of the Court's opinion in this case expressed the view in *Medrano* that legislative silence after a statute has been judicially construed is very persuasive evidence of legislative approval of that judicial construction:

In addition, the majority's rationale for overruling [this Court's overruled precedent] distorts this Court's precedent and authority. There are several problems with the majority's analysis. First, long-

standing case law says explicitly that if the legislature does not amend a statute after it has been judicially construed, we assume that the legislature approved the judicial construction. (Citations omitted). Contrary to that long-established precedent, the majority contends that "legislative inaction does not necessarily equate to legislative approval." Whether or not that is true, the assertion is made without reference to any authority. Second, not only did the legislature not "immediately amend" [the applicable statute] in response to [this Court's overruled precedent], it has not, to this day, made any changes to it. Third, if this Court can overrule precedent simply by saying that it can, what has become of *stare decisis?* Are we now to decide issues without even considering the collected wisdom of the past? Finally, how are we to know when legislative inaction following a judicial interpretation of a statute is agreement with the interpretation and when it is the legislature sitting back and waiting for this Court to recognize that it has made an error and remedy that error on its own?
*See Medrano*, 67 S.W.3d at 904 (Johnson, J., concurring only in the decision to remand).

*decisis.* It is, therefore, difficult not to conclude that the Court ignores this rule and overrules *Norris* simply because, it can. *But see Medrano,* 67 S.W.3d at 904 (Johnson, J., concurring only in the decision to remand) ("[I]f this Court can overrule precedent simply by saying it can, what has become of *stare decisis?* ").

I respectfully dissent.