

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

———————————————

No. 06-09-00124-CR

———————————————

CHRISTOPHER LYNN HOWARD, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 37,568-A

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

A Gregg County jury found Christopher Lynn Howard guilty of aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003). The jury assessed an enhanced punishment of life in prison.

## I.    FACTUAL BACKGROUND

At around 9:45 p.m. on October 7, 2008, Mukesh Patolia was preparing to close his convenience store in Longview. Immediately after he finished dealing with the last customer of the night, he went to the store's back office to search the Internet for information relating to the presidential debates that occurred earlier in the evening. After having been in the back office for approximately one minute, he saw on the security camera monitors a man enter the store wearing a full-face covering and carrying a large gun.

Patolia shut and locked the office door, remaining inside the office. He called 9-1-1. From his position in the office, Patolia was able to watch the gunman by way of the security camera monitors and a mirrored window facing into the store. He watched the gunman move about the store and look in the restroom, an action Patolia presumed was done in search of store employees or customers. At one point, as Patolia remained on the telephone in his hiding place, he stopped talking to the 9-1-1 dispatcher because he heard the gunman moving outside the office door.

2

Patolia watched as the gunman took money from beneath the counter and also took Patolia's wallet from behind the counter. It appeared the gunman was unable to get into the cash register. The gunman fled the store, encountering the promptly-responding Longview Police Department officers who had just arrived outside seconds earlier. Officers Ryan Gibson and Anthony Minyard got back into their patrol car and gave chase to the running suspect. When Minyard noticed a man sitting alone in his car parked underneath a covered area at a nearby body shop, he thought this suspicious because, in the three years that he has worked in that area, no one has ever been parked there at that time of night.

Gibson and Minyard got out of their vehicle and approached the suspicious vehicle. Gibson shone his flashlight into the interior, giving both officers a clear look at the man's face and allowing them to note that the man had a tattoo under his right eye. The driver then fled in his vehicle. Gibson and Minyard provided fellow officers a description of the car and its direction. Several officers joined the pursuit, and others set up a perimeter around the area. During the pursuit, an officer was able to get a license plate number and from that information, dispatch released the possible identification of the suspect: Chris Howard.[1] Gibson and Minyard used their in-car computer to access a photograph of Howard and confirmed that Howard was the man the two officers had confronted in the body shop parking lot.

The pursuit was not an extremely lengthy one; the gunman ultimately abandoned his vehicle at an apartment complex parking lot and again started running. He eluded police that

[1]The vehicle had been stopped a few days earlier and Howard was identified as the driver.

night, but left behind his car and, in his car, a good deal of evidence relating to the robbery. Howard was arrested a few days later at his residence.

Howard now appeals his conviction for aggravated robbery. He first challenges the legal and factual sufficiency of the evidence to support the jury's verdict. Specifically, he maintains that since he never came in contact or had any confrontation with Patolia, the State could not prove that he committed the elements of aggravated robbery. He also challenges the State's evidence of identity. We conclude that legally and factually sufficient evidence supports the conviction, overrule Howard's points of error, and affirm the trial court's judgment.

## II.    STANDARDS OF REVIEW

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009); *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light instead of the light most favorable to the verdict. We determine whether the evidence supporting the verdict is either too weak to support the fact-finder's verdict, or, considering conflicting evidence, is so outweighed by the great weight and preponderance of the evidence that the jury's

4

verdict is clearly wrong and manifestly unjust. *Laster*, 275 S.W.3d at 518; *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts*, 220 S.W.3d at 524; *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

The legal and factual sufficiency of the evidence is measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997); *Wooley v. State*, 273 S.W.3d 260 (Tex. Crim. App. 2008). This charge accurately promulgates the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense. *Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008).

## III. ELEMENTS OF AGGRAVATED ROBBERY

The Texas Penal Code provides that a person commits the offense of robbery if,

> in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he or she (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

TEX. PENAL CODE ANN. § 29.02 (Vernon 2003). The offense becomes aggravated robbery, a first degree felony, when the actor, *inter alia*, uses or exhibits a deadly weapon. *See* TEX. PENAL CODE ANN. § 29.03(a)(2). The hypothetically correct jury charge would contain these requirements.[2]

---

[2]No objection to the jury charge was presented to the trial court, and there is no complaint about it on appeal.

We first point out that it is not a specific element of the offense of aggravated robbery that the actor have a confrontation with another person. The relevant statutes require that the actor threaten or place another in fear of bodily injury or death. There need not be a physical altercation to satisfy this element. Under the "placed in fear" language of Section 29.02, the fact-finder may conclude that an individual was "placed in fear" in circumstances where no actual threats are conveyed. *See Burton v. State*, 230 S.W.3d 846, 852 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Williams v. State*, 827 S.W.2d 614, 616 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). We, therefore, review the evidence to determine whether it sufficiently satisfied the element of threatening or placing another in fear of imminent bodily injury or death.

In this context, a person acts knowingly, or with knowledge, with respect to a result of his or her conduct when the person is aware that his or her conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b). The element of the crime of robbery, "*places* another in fear of imminent bodily injury," differs from an often compared but vastly dissimilar element, "*threatens* another with imminent bodily injury." *Williams*, 827 S.W.2d at 616. The general, passive requirement that another be "placed in fear" cannot be equated with the specific, active requirement that the actor "threatens another with imminent bodily injury." *Id.* Under the "placed in fear" language, the fact-finder may conclude that an individual perceived fear or was "placed in fear," in circumstances where no actual threats were conveyed by the accused. *Id.* To

6

commit robbery, the accused need not expressly threaten another or display a weapon. *Pitte v. State*, 102 S.W.3d 786, 792–93 (Tex. App.—Texarkana 2003, no pet.).

Here, Howard entered a convenience store late at night wearing a mask that on video looks similar to Ku Klux Klan headgear. At all times, he was in possession of a long firearm that was described as looking like an SKS assault rifle. From his vantage point, Patolia saw the masked gunman come into the store carrying a "big gun." The gunman moved about the store in a manner suggesting to Patolia that the gunman was searching for someone inside the store (i.e., checking the restroom). Patolia heard the gunman outside the office door. He stopped talking to the 9-1-1 dispatcher out of fear the gunman would hear him. Detective Chris Taylor testified that the door to the office was rather flimsy and could have "easily [been] defeated." Patolia testified that he was concerned that he would be injured or killed, and he testified that such fear led him to be concerned about the welfare of his wife and elderly parents, who depended on him. He worried how his family would fare in the event he was killed in the robbery.

The surveillance footage is consistent with Patolia's testimony and provides a more precise time frame in which the gunman remained in the area of the office. The footage shows that approximately one minute and twelve seconds after Patolia left the front counter to go to the back office, a masked gunman hastily entered the front door and, within fifteen seconds, checked the restroom. He moved quickly in a crouched position and constantly looked about the store, always in possession of the long rifle. After spending approximately one minute behind the counter, the

7

gunman headed deliberately to the back of the store where the office is located. For approximately thirty seconds, he remained out of the cameras' view while he stayed in the general vicinity of the office. He returned to the register and began trying to get it open. Finally, after an encounter with an unsuspecting customer in which the gunman crouched lower behind the counter, disregarded the customer, and continued to try to open the register, the gunman momentarily looked out the front door and quickly exited the store.

A jury could reasonably infer that when Howard entered the store so armed and dressed, he anticipated that some clerk would be on duty; his actions in searching the interior of the store are consistent with a belief on his part that someone was in some part of the store. The entire series of events by Howard leads to a reasonable inference that Howard was reasonably certain his conduct, dress, and possession of a large rifle would place a store attendant in fear of imminent bodily injury or death. The very purpose of exhibiting a deadly weapon is to produce fear in the mind of the store attendant so that he or she will comply without resistance. The evidence also fully supports a finding that Patolia's fear of imminent bodily injury was a reasonable belief arising from the conduct of Howard. *See Williams*, 827 S.W.2d at 616.

Though there is no evidence that Howard attempted to gain entrance to the office, there is evidence that he was present outside the office door for some time and that such presence while bearing a large firearm placed the hiding Patolia in fear of imminent bodily injury or death. The fact that Patolia made it through the experience without injury and without actually having to be

face to face with the assault-type rifle does not mean that he was not reasonably fearful that the masked, armed man standing outside the flimsy office door would cause him bodily injury or death. We conclude that the evidence is both legally and factually sufficient to support the jury's verdict.

## IV. IDENTITY

Patolia testified and the surveillance camera footage shows that the gunman who entered the store had his entire head covered save his eyes. Patolia admitted that he did not see the gunman's face. The surveillance footage shows that the gunman wore a light grey shirt or jacket with a thick black or dark-colored stripe running across the top of each shoulder; the long facial covering obscures the front of the shirt or jacket. In-dash cameras from the police pursuit showed a man leaving the car being pursued wearing a shirt styled in the same manner. After the police found a man in a nearby suspiciously-parked vehicle during the pursuit of the suspect from the scene of the crime, the officers made note of the distinct tattoo on the suspect's face. That same suspect then fled in a car that was traced to Howard, and police were able to confirm his identity by a photograph of Howard showing the same facial tattoo. As the pursuit of the vehicle ended, a police car came in contact with Howard's car, forcing him to touch the police officer's car in order to flee the area. Later testing could not provide a definitive match because the fingerprints taken from the police car were not clear enough. Howard ran from the car and was able to avoid immediate arrest.

In the car from which Howard fled, police officers discovered an assault-type rifle consistent with the one in the surveillance footage, black socks consistent with the hand coverings shown in the surveillance footage, Patolia's wallet, and white T-shirts consistent with the face covering used in the robbery. Discovery of these items in the car, from which Howard fled, link Howard directly to the crime. The clothing, the identification through the vehicle, the recognition of the facial tattoo, and the immediate discovery of items relating to the crime are legally sufficient evidence to support the jury's finding as to the element of identity.

The jury was free to disbelieve the evidence that would suggest someone other than Howard was driving the car that night. In a custodial statement, Howard maintained that he was in Dallas the day of the robbery. He maintained that he was with one Brandon McCloud, although police were never able to locate McCloud to confirm Howard's story. Howard was unable to provide police with any contact information for McCloud. Howard also suggested that he sold the car prior to the date of the robbery. Howard's sister and his niece testified that Howard had sold the vehicle in question to a man named Anthony or "A.D." or "A.T." Neither witness was able to provide any more information about "Anthony," nor any details regarding the alleged sale other than it may have taken place on a weekday in October. Contradictory to Howard's story about having sold the car, Detective Taylor testified that on the dash of the abandoned car, there was a picture of Howard and an unidentified male, an unlikely automobile accessory if the car had, in fact, been sold to another person whose last name and contact

10

information no one connected to the case was able to provide. Also discovered in the car was a bill of sale bearing Howard's name as purchaser of the car.

We conclude that the evidence is not too weak to support the fact-finder's verdict. Further, considering this evidence suggesting that someone other than Howard was the person who was in the car that night, we cannot say that the evidence supporting the verdict is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong and manifestly unjust. We overrule Howard's point of error.

## V. CONCLUSION

Having concluded that the evidence is legally and factually sufficient to support the jury's verdict, we overrule Howard's points of error and affirm the trial court's judgment.


Jack Carter
Justice

Date Submitted:    January 19, 2010
Date Decided:     February 23, 2010

Publish