In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00178-CR


______________________________




SHAUNA L. CASTILLO, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 36603-B




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Shauna L. Castillo appeals her conviction on her open plea of guilty to the state jail felony
offense of possession of a controlled substance. The trial court sentenced her to two years'
confinement, but suspended imposition of sentence and placed Castillo on community supervision.

 Castillo contends that she was denied due process because the trial court abused its discretion
by refusing to consider the full range of punishment, including deferred adjudication of guilt.

 The Constitutional mandate of due process requires a neutral and detached judicial officer
who will consider the full range of punishment and mitigating evidence. See Gagnon v. Scarpelli,
411 U.S. 778, 786-87 (1973). A trial court denies due process when it arbitrarily refuses to consider
the entire range of punishment for an offense or refuses to consider mitigating evidence and imposes
a predetermined punishment. Ex parte Brown, 158 S.W.3d 449, 454 (Tex. Crim. App. 2005). In
the absence of a clear showing to the contrary, we presume that the trial court was neutral and
detached. Fielding v. State, 719 S.W.2d 361, 366 (Tex. App.--Dallas 1986, pet. ref'd) (citing
Thompson v. State, 641 S.W.2d 920, 921 (Tex. Crim. App. 1982)).

 Castillo contends the record shows that the court refused to consider the full range of
punishment and thus violated her due process rights because the trial court's comments reveal a bias
against the full range of punishment which prevented the court from weighing the punishment
evidence and assessing sentence in an objective way. 

 A court denies due process and due course of law if it arbitrarily refuses to consider the entire
range of punishment for an offense or refuses to consider the evidence and imposes a predetermined
punishment. Granados v. State, 85 S.W.3d 217 (Tex. Crim. App. 2002); Johnson v. State, 982
S.W.2d 403, 405 (Tex. Crim. App. 1998). However, such a complaint is not preserved for review
unless a timely objection is raised. Teixeira v. State, 89 S.W.3d 190, 192 (Tex. App.--Texarkana
2002, pet. ref'd); Washington v. State, 71 S.W.3d 498, 499 (Tex. App.--Tyler 2002, no pet.); Cole
v. State, 757 S.W.2d 864, 865 (Tex. App.--Texarkana 1988, pet. ref'd). No objection was made to
the court's ruling; thus, the complaint was not preserved. 

 Even if we could properly reach this issue, the record does not show that the trial court did
not consider the entire range of punishment. What the record does show is that the court did not find
deferred adjudication appropriate for this defendant. The record shows the following colloquy
during the punishment phase of the trial:

 [State]: Judge, you know this is an automatic probation case. 
However, the State does have concerns because we're dealing with drugs. Looking
at the p.s.i., on Page 4 and on Page 7, and apparently it says her last reported use of
methamphetamine was December 31st, 2007. This arrest date was January 22nd,
2007, so that means she must have been using drugs while she was out on bond. 
Obviously, the State is concerned about that. And the State would ask for a longer
period of probation.


 THE COURT: Okay.


 [Defense Counsel]: Judge, I apologize. I didn't realize the date on there. My
client has never had any criminal history at all. She was very open and honest with
the Court in her p.s.i. And she has asked me to ask the Court to consider deferred. 
I've told her that I thought that would never happen in a million years, that this Court
-- I've had it happen once in my entire life in this county, and so I suspect it wouldn't
happen. But I told her I would ask.


 THE COURT: Well, it is a rarity and -- .


 [Defense Counsel]: And I told her that. But I told her I would ask, Your
Honor, and I'm asking on her behalf, but I told her I didn't think that would happen.


 THE COURT: Well, it's a part of the law, and I will consider every
part of the law.


 [Defense Counsel]: I explained that to her, Judge.


 THE COURT: But I use deferred sparingly.


 [Defense Counsel]: I understand.


 THE COURT: And I'm not going to do it in this case for the simple
reason that she's continued to use drugs while out on bond.


 We conclude the record does not show that the trial court failed to consider the entire range
of punishment, nor does it show that the court had a bias against deferred adjudication--it does show
that the court believed deferred adjudication was not appropriate for this particular defendant's
situation. Thus, no error would be shown in any event. 

 The contention of error is overruled.

 We affirm the trial court's judgment.



 Jack Carter

 Justice


Date Submitted: January 2, 2009

Date Decided: January 6, 2009


Do Not Publish



lse"
 UnhideWhenUsed="false" Name="Light Shading Accent 2"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00124-CR

                                                ______________________________

 

 

                           CHRISTOPHER LYNN HOWARD,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the
188th Judicial District Court

                                                             Gregg County, Texas

                                                          Trial Court
No. 37,568-A

 

                                                       
                                           

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                          Opinion by Justice Carter








                                                                   O P I N I O N

 

            A
Gregg County jury found Christopher Lynn Howard guilty of aggravated
robbery.  See Tex. Penal Code Ann.
§ 29.03 (Vernon 2003).  The jury assessed
an enhanced punishment of life in prison. 


I.          FACTUAL BACKGROUND

            At
around 9:45 p.m. on October 7, 2008, Mukesh Patolia was preparing to close his
convenience store in Longview. 
Immediately after he finished dealing with the last customer of the
night, he went to the stores back office to search the Internet for
information relating to the presidential debates that occurred earlier in the
evening.  After having been in the back
office for approximately one minute, he saw on the security camera monitors a
man enter the store wearing a full-face covering and carrying a large gun.  

            Patolia
shut and locked the office door, remaining inside the office.  He called 9-1-1.  From his position in the office, Patolia was
able to watch the gunman by way of the security camera monitors and a mirrored
window facing into the store.  He watched
the gunman move about the store and look in the restroom, an action Patolia
presumed was done in search of store employees or customers.  At one point, as Patolia remained on the telephone
in his hiding place, he stopped talking to the 9-1-1 dispatcher because he
heard the gunman moving outside the office door. 

            Patolia
watched as the gunman took money from beneath the counter and also took Patolias
wallet from behind the counter.  It
appeared the gunman was unable to get into the cash register.  The gunman fled the store, encountering the
promptly-responding Longview Police Department officers who had just arrived
outside seconds earlier.  Officers Ryan
Gibson and Anthony Minyard got back into their patrol car and gave chase to the
running suspect.  When Minyard noticed a
man sitting alone in his car parked underneath a covered area at a nearby body
shop, he thought this suspicious because, in the three years that he has worked
in that area, no one has ever been parked there at that time of night.  

            Gibson
and Minyard got out of their vehicle and approached the suspicious
vehicle.  Gibson shone his flashlight
into the interior, giving both officers a clear look at the mans face and
allowing them to note that the man had a tattoo under his right eye.  The driver then fled in his vehicle.  Gibson and Minyard provided fellow officers a
description of the car and its direction. 
Several officers joined the pursuit, and others set up a perimeter
around the area.  During the pursuit, an
officer was able to get a license plate number and from that information,
dispatch released the possible identification of the suspect:  Chris Howard.[1]  Gibson and Minyard used their in-car computer
to access a photograph of Howard and confirmed that Howard was the man the two
officers had confronted in the body shop parking lot.  

            The
pursuit was not an extremely lengthy one; the gunman ultimately abandoned his
vehicle at an apartment complex parking lot and again started running.  He eluded police that night, but left behind
his car and, in his car, a good deal of evidence relating to the robbery.  Howard was arrested a few days later at his
residence.  

            Howard
now appeals his conviction for aggravated robbery.  He first challenges the legal and factual
sufficiency of the evidence to support the jurys verdict.  Specifically, he maintains that since he
never came in contact or had any confrontation with Patolia, the State could
not prove that he committed the elements of aggravated robbery.  He also challenges the States evidence of
identity.  We conclude that legally and
factually sufficient evidence supports the conviction, overrule Howards points
of error, and affirm the trial courts judgment.

II.        STANDARDS OF REVIEW

            In reviewing the legal sufficiency of the evidence, we
view all of the evidence in the light most favorable to the prosecution and
determine whether, based on that evidence and reasonable inferences therefrom,
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Laster v.
State, 275 S.W.3d 512, 51718 (Tex. Crim. App. 2009); Roberts v. State,
273 S.W.3d 322 (Tex. Crim. App. 2008); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000).

            In
a factual sufficiency review, we review all the evidence, but do so in a
neutral light instead of the light most favorable to the verdict.  We determine whether the evidence supporting
the verdict is either too weak to support the fact-finders verdict, or,
considering conflicting evidence, is so outweighed by the great weight and
preponderance of the evidence that the jurys verdict is clearly wrong and
manifestly unjust.  Laster, 275
S.W.3d at 518; Lancon v. State,
253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts, 220 S.W.3d at 524;
Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v.
State, 204 S.W.3d 404, 41415 (Tex. Crim. App. 2006); Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

            The
legal and factual sufficiency of the evidence is measured by the elements of
the offense as defined by the hypothetically correct jury charge for the case.  Malik v.
State, 953 S.W.2d 234 (Tex. Crim. App. 1997); Wooley v. State, 273 S.W.3d 260 (Tex. Crim. App. 2008).  This charge accurately promulgates the law,
is authorized by the indictment, does not unnecessarily increase the States
burden of proof or restrict the States theories of liability, and adequately
describes the particular offense.  Grotti v. State, 273 S.W.3d 273, 280
(Tex. Crim. App. 2008).  

III.       ELEMENTS OF AGGRAVATED
ROBBERY

            The
Texas Penal Code provides that a person commits the offense of robbery if, 

in the course of committing theft as defined in
Chapter 31 and with intent to obtain or maintain control of the property, he or
she (1) intentionally, knowingly, or recklessly causes bodily injury to
another; or (2) intentionally or knowingly threatens or places another in fear
of imminent bodily injury or death. 

 

Tex.
Penal Code Ann. § 29.02 (Vernon 2003). 
The offense becomes aggravated robbery, a first degree felony, when the
actor, inter alia, uses or exhibits a
deadly weapon.  See Tex. Penal Code Ann.
§ 29.03(a)(2).  The hypothetically
correct jury charge would contain these requirements.[2] 

            We
first point out that it is not a specific element of the offense of aggravated
robbery that the actor have a confrontation with another person.  The relevant statutes require that the actor
threaten or place another in fear of bodily injury or death.  There need not be a physical altercation to
satisfy this element.  Under the placed
in fear language of Section 29.02, the fact-finder may conclude that an
individual was placed in fear in circumstances where no actual threats are
conveyed.  See Burton v. State, 230
S.W.3d 846, 852 (Tex. App.Houston [14th Dist.] 2007, no pet.); Williams v. State, 827 S.W.2d 614, 616 (Tex.
App.Houston [1st Dist.] 1992, pet. refd). 
We, therefore, review the evidence to determine whether it sufficiently
satisfied the element of threatening or placing another in fear of imminent
bodily injury or death.  

            In
this context, a person acts knowingly, or with knowledge, with respect to a
result of his or her conduct when the person is aware that his or her conduct
is reasonably certain to cause the result. 
Tex. Penal Code Ann. § 6.03(b).  The element of the crime of robbery, places another in fear of imminent
bodily injury, differs from an often compared but vastly dissimilar element, threatens another with imminent bodily
injury.  Williams, 827 S.W.2d at 616.  The general, passive requirement that another
be placed in fear cannot be equated with the specific, active requirement
that the actor threatens another with imminent bodily injury.  Id.  Under the placed in fear language, the fact-finder
may conclude that an individual perceived fear or was placed in fear, in
circumstances where no actual threats were conveyed by the accused.  Id.  To commit robbery, the accused need not
expressly threaten another or display a weapon.  Pitte v.
State, 102 S.W.3d 786, 79293 (Tex. App.Texarkana 2003, no pet.).

            Here,
Howard entered a convenience store late at night wearing a mask that on video
looks similar to Ku Klux Klan headgear. 
At all times, he was in possession of a long firearm that was described
as looking like an SKS assault rifle. 
From his vantage point, Patolia saw the masked gunman come into the
store carrying a big gun.  The gunman
moved about the store in a manner suggesting to Patolia that the gunman was
searching for someone inside the store (i.e., checking the restroom).  Patolia heard the gunman outside the office
door.  He stopped talking to the 9-1-1
dispatcher out of fear the gunman would hear him.  Detective Chris Taylor testified that the
door to the office was rather flimsy and could have easily [been] defeated.  Patolia testified that he was concerned that
he would be injured or killed, and he testified that such fear led him to be
concerned about the welfare of his wife and elderly parents, who depended on
him.  He worried how his family would
fare in the event he was killed in the robbery. 


            The
surveillance footage is consistent with Patolias testimony and provides a more
precise time frame in which the gunman remained in the area of the office.  The footage shows that approximately one
minute and twelve seconds after Patolia left the front counter to go to the
back office, a masked gunman hastily entered the front door and, within fifteen
seconds, checked the restroom.  He moved
quickly in a crouched position and constantly looked about the store, always in
possession of the long rifle.  After
spending approximately one minute behind the counter, the gunman headed
deliberately to the back of the store where the office is located.  For approximately thirty seconds, he remained
out of the cameras view while he stayed in the general vicinity of the
office.  He returned to the register and
began trying to get it open.  Finally,
after an encounter with an unsuspecting customer in which the gunman crouched
lower behind the counter, disregarded the customer, and continued to try to
open the register, the gunman momentarily looked out the front door and quickly
exited the store.    

            A
jury could reasonably infer that when Howard entered the store so armed and
dressed, he anticipated that some clerk would be on duty; his actions in
searching the interior of the store are consistent with a belief on his part
that someone was in some part of the store. 
The entire series of events by Howard leads to a reasonable inference
that Howard was reasonably certain his conduct, dress, and possession of a
large rifle would place a store attendant in fear of imminent bodily injury or
death.  The very purpose of exhibiting a
deadly weapon is to produce fear in the mind of the store attendant so that he
or she will comply without resistance. 
The evidence also fully supports a finding that Patolias fear of
imminent bodily injury was a reasonable belief arising from the conduct of
Howard.  See Williams, 827 S.W.2d at 616. 


            Though
there is no evidence that Howard attempted to gain entrance to the office,
there is evidence that he was present outside the office door for some time and
that such presence while bearing a large firearm placed the hiding Patolia in
fear of imminent bodily injury or death. 
The fact that Patolia made it through the experience without injury and
without actually having to be face to face with the assault-type rifle does not
mean that he was not reasonably fearful that the masked, armed man standing outside
the flimsy office door would cause him bodily injury or death.  We conclude that the evidence is both legally
and factually sufficient to support the jurys verdict.

IV.       IDENTITY

            Patolia
testified and the surveillance camera footage shows that the gunman who entered
the store had his entire head covered save his eyes.  Patolia admitted that he did not see the
gunmans face.  The surveillance footage
shows that the gunman wore a light grey shirt or jacket with a thick black or
dark-colored stripe running across the top of each shoulder; the long facial
covering obscures the front of the shirt or jacket.  In-dash cameras from the police pursuit
showed a man leaving the car being pursued wearing a shirt styled in the same
manner.  After the police found a man in
a nearby suspiciously-parked vehicle during the pursuit of the suspect from the
scene of the crime, the officers made note of the distinct tattoo on the
suspects face.  That same suspect then
fled in a car that was traced to Howard, and police were able to confirm his
identity by a photograph of Howard showing the same facial tattoo.  As the pursuit of the vehicle ended, a police
car came in contact with Howards car, forcing him to touch the police officers
car in order to flee the area.  Later
testing could not provide a definitive match because the fingerprints taken
from the police car were not clear enough. 
Howard ran from the car and was able to avoid immediate arrest.  

            In
the car from which Howard fled, police officers discovered an assault-type
rifle consistent with the one in the surveillance footage, black socks
consistent with the hand coverings shown in the surveillance footage, Patolias
wallet, and white T-shirts consistent with the face covering used in the
robbery.  Discovery of these items in the
car, from which Howard fled, link Howard directly to the crime.  The clothing, the identification through the
vehicle, the recognition of the facial tattoo, and the immediate discovery of
items relating to the crime are legally sufficient evidence to support the jurys
finding as to the element of identity. 

            The
jury was free to disbelieve the evidence that would suggest someone other than
Howard was driving the car that night. 
In a custodial statement, Howard maintained that he was in Dallas the
day of the robbery.  He maintained that
he was with one Brandon McCloud, although police were never able to locate
McCloud to confirm Howards story. 
Howard was unable to provide police with any contact information for
McCloud.  Howard also suggested that he
sold the car prior to the date of the robbery. 
Howards sister and his niece testified that Howard had sold the vehicle
in question to a man named Anthony or A.D. or A.T.  Neither witness was able to provide any more
information about Anthony, nor any details regarding the alleged sale other
than it may have taken place on a weekday in October.  Contradictory to Howards story about having
sold the car, Detective Taylor testified that on the dash of the abandoned car,
there was a picture of Howard and an unidentified male, an unlikely automobile
accessory if the car had, in fact, been sold to another person whose last name
and contact information no one connected to the case was able to provide.  Also discovered in the car was a bill of sale
bearing Howards name as purchaser of the car. 


            We
conclude that the evidence is not too weak to support the fact-finders
verdict.  Further, considering this
evidence suggesting that someone other than Howard was the person who was in
the car that night, we cannot say that the evidence supporting the verdict is
so outweighed by the great weight and preponderance of the evidence that the
jurys verdict is clearly wrong and manifestly unjust.  We overrule Howards point of error.  

V.        CONCLUSION

            Having concluded that
the evidence is legally and factually sufficient to support the jurys verdict,
we overrule Howards points of error and affirm the trial courts judgment.

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date
Submitted:          January 19, 2010

Date
Decided:             February 23, 2010

 

Publish











[1]The
vehicle had been stopped a few days earlier and Howard was identified as the
driver.  





[2]No
objection to the jury charge was presented to the trial court, and there is no
complaint about it on appeal.