

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00171-CR

_____


ANDREAS TEARRI MORRIS, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 196th Judicial District Court
Hunt County, Texas
Trial Court No. 25554



Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Eighteen-year-old Cordarien Kelly's body lay riddled with bullets after he was shot from behind when leaving the Greenville home of an acquaintance July 1, 2007. Three eyewitnesses identified Andreas Tearri Morris as Kelly's shooter. Morris, convicted of Kelly's murder by a Hunt County jury and sentenced to life imprisonment, attacks the sufficiency of the evidence as coming from inconsistent and unreliable witnesses and attacks the sentence as being disproportionate. We affirm Morris' conviction because (1) legally and factually sufficient evidence supports Morris' conviction, and (2) Morris' disproportionate-sentence claim was not preserved for our review.

*(1)     Legally and Factually Sufficient Evidence Supports Morris' Conviction*

Morris asserts that the evidence is both legally and factually insufficient to prove beyond a reasonable doubt that he was the person who murdered Kelly.

In evaluating the legal and factual sufficiency of the evidence, we use a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

Under a hypothetically correct charge in this case, the jury was required to find, beyond a

2

reasonable doubt, that Morris (1) on or about July 1, 2007, (2) in Hunt County, Texas, (3) intentionally and knowingly, (4) caused the death of Kelly, (5) by shooting Kelly with a firearm.[1]

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009); *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light instead of the light most favorable to the verdict. We determine whether the evidence supporting the verdict is either too weak to support the fact-finder's verdict, or, considering conflicting evidence, is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong and manifestly unjust. *Laster*, 275 S.W.3d at 518; *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

Morris' attack on the evidence focuses on the proof of his identity as the shooter. Indeed, identification of Morris as the person who committed the murder is part of the State's burden of proof beyond a reasonable doubt. *See Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *Wiggins v. State*, 255 S.W.3d 766, 771 (Tex. App.—Texarkana 2008, no pet.). When, as

---

[1] *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003).

3

here, the identity element of the offense is contested, we are mindful that identity may be proven by direct evidence, circumstantial evidence, or even inferences. *Wiggins*, 255 S.W.3d at 771; *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). Here, we have direct, in-court identification by three witnesses of Morris as the shooter. Morris contends, however, that this testimony was contradictory, inconsistent, and objectively unreliable.

### A. Testimony of Wendy Talley

On the afternoon of July 1, 2007, Wendy Talley was at home on her front porch, from which she could see the driveway of the house next door. Talley saw Morris standing alone in the driveway [2] that afternoon, smoking a Black and Mild. [3] Talley had seen Morris in the neighborhood on previous occasions, and it was not unusual to see him that day. Talley knew Kelly, and saw him arrive on Wellington Street that afternoon with Michelle Spradling. [4] Spradling parked her car in the driveway two houses down from Talley. Kelly walked over to the house next to Talley's—walking past Morris—who was still standing in the driveway. Kelly emerged from the house a few minutes later and was walking back to the car when Morris "opened up fire on him." Kelly's back was to Morris when Morris emptied his pistol; Morris continued to

---

[2] The driveway runs between Talley's house and the house next door. There were no cars in the driveway.

[3] Talley testified that the cigar looked like a Black and Mild because it had a tip on it.

[4] Kelly and Spradling were in the neighborhood "all the time."

4

shoot after Kelly fell to the ground.[5]  After reloading his pistol, Morris fled the scene in his car, which had been parked on the side of the road.

Later, Talley spoke with Detective Cole with the Greenville Police Department about the murder.  At this meeting, Talley was able, in a photographic line-up, to identify Morris as the shooter.[6]  Talley also identified Morris in the courtroom as the individual who shot Kelly on the afternoon of July 1, 2007.[7] Even though there were many people in the community who did not want her to testify, Talley was determined to do so because she is concerned about the safety of her neighborhood.

### B.      Testimony of Anthony Jones

Anthony Jones is a seventeen-year-old student at Greenville High School who spent time on Wellington Street in the summer of 2007.[8] Jones grew up with Kelly, and the two ran track together.   Jones also knows Morris, as Morris grew up with the Jones brothers.

As he was walking through a vacant lot between Polk and Wellington Streets on the afternoon of July 1, 2007, Jones heard gunshots.   When Jones looked in the direction of the shots, he saw Morris shooting Kelly.   Kelly was trying to run, but then fell to the ground.   Jones saw Kelly and Morris before he heard the shots, when Kelly emerged from the third house on

---

[5]Talley never saw the pistol until Morris began to fire.

[6]Morris does not contest the validity of this identification procedure.

[7]Talley does not know Morris personally, but knows who he is and knows his family.

[8]Jones lives on Walnut Street, approximately two blocks from Wellington Street.

Wellington and walked at an angle toward the street. It looked as if Morris came out of the second house on Wellington. Both were walking toward the street and toward one another when Morris fired his gun.[9] Kelly was between the two houses, close to the street, when he was shot. After having seen this, Jones hid behind some bushes; after about five minutes, he walked back home. At trial, Jones identified Morris as the shooter.

Jones did not report his knowledge of this event to the police until December 2007, when he was arrested for possession of marihuana.[10] At that time, Jones told law enforcement officers what he knew about Kelly's murder. Jones did not come forward earlier because he wanted nothing to do with it, and denied that the district attorney's office "worked out a deal" for his testimony.

### C. Testimony of Xavier Jones

On the afternoon of July 1, 2007, Xavier Jones was on Wellington Street visiting with Tristan Carter.[11] Xavier and Carter were standing in the front yard when a car, driven by Spradling,[12] pulled into the driveway. Kelly[13] was in the passenger seat, and Spradling's

---

[9]Jones does not recall having seen a vehicle in the driveway of either of the houses, and he did not see anyone else in the area of the shooting.

[10]As a result of his arrest, Jones was ordered by the court to receive drug counseling.

[11]Xavier is currently serving a six-year concurrent sentence in the Texas Department of Criminal Justice for aggravated robbery, burglary of a habitation, and possession of a controlled substance.

[12]Jones was also acquainted with Spradling and Morris. Kelly, Carter, and Xavier are all about the same age; Morris is older.

children were in the back seat.   When Kelly got out of the car, he and Xavier spoke briefly before Kelly walked to the house next door.   Spradling remained in the car.   Xavier saw Morris, as Kelly walked next door.   It was neither unusual to see Morris "hanging out" on Wellington Street, nor unusual to see Kelly on Wellington Street. On this day, however, Xavier Jones saw Morris shoot Kelly.   After he heard about two gunshots, Xavier ran through the house and into the woods behind the house, as more shots were being fired.   Xavier returned to Wellington Street after the police arrived, but he was "too shocked" to talk to them.

Xavier had previously provided the police with a sworn statement indicating that he did not witness Kelly's murder.[14]   He denies having been promised anything in exchange for his testimony and admits that he lied to the police in the past and has been convicted of doing so.[15]

D.      *Testimony of Michelle Spradling*

Spradling's testimony did not identify Morris as the shooter, but adds to the narrative.   On the day of his murder, Kelly called Spradling for a ride to Wellington Street.   Spradling, along with her two young children seated in the back seat of the car, met Kelly at a store and drove him to Wellington Street.   Spradling parked in a driveway twenty to thirty feet from the house Kelly

---

[13]Jones knew Kelly and considered him to be a friend.
[14]Jones' statement reads,

> I was not around when KD was killed on Welletion [sic] Street.   I was on Speedway Street at the time with my family and I got a call that KD was dead layin [sic] on the ground.

[15]The charges in that case were failure to identify and giving false or fictitious information.

7

visited.[16]  While waiting for Kelly, Spradling got out of the car to visit with Xavier and Tristan Carter, who were standing under a nearby shade tree.  Jones and Carter were also friends of Kelly.

After three or four minutes, Kelly emerged from the house and began walking back to the car.  When she saw Kelly, Spradling returned to the car.  Once inside, Spradling heard a series of gunshots and saw one black male—the shooter.  When she saw Kelly fall to the ground, Spradling immediately fled the scene.  While Spradling later came forward to give a statement to the authorities, she could identify the shooter only as a black male.

E.      *Analysis of the Evidence*

Morris claims the evidence is factually insufficient because, when all of the evidence taken together is viewed in a neutral light, it is so weak that the verdict is clearly wrong and unjust.  Two of the eyewitnesses testified only after they were accused of their own offenses.  The reliability of testimony is debatable and even insufficient, claims Morris, given Spradling's testimony that she did not see the shooter from a short distance, and Talley testified she saw the shooter from a greater distance.  Further, the murder weapon was never located, and there was no evidence Morris ever owned a gun.

Anthony Jones' testimony might be disbelieved because it contradicts that given by Spradling and because it came months after the shooting and only after he had been arrested on a narcotics charge.  Talley's testimony might be disbelieved because her physical view of the

---

[16]Spradling testified that Kelly did not have a gun with him.

8

events here can be called into question. Further, Talley testified that many people come and go from the residence where Kelly was killed, and she did not personally know Morris.

The testimony of Xavier Jones might be disbelieved simply because he readily admits to having been convicted of lying to authorities in the past, and in this case, he provided the police with a false statement regarding his whereabouts at the time of the shooting. Further, he is currently serving prison time for three felony convictions. Indeed, his character and veracity are not sterling.

Morris contends this testimony is so unreliable and conflicts to such a degree that any rational jury must find reasonable doubt as to the identity of the shooter. He argues this especially in light of the fact that the murder weapon was never located, and in the absence of evidence that Morris was known to carry a weapon. Morris also points out that there is no forensic evidence linking him to the shooting.

When we view this evidence in the light most favorable to the prosecution, it is plain that a rational trier of fact could have found the essential elements of the crime of murder, including identification of Morris as the shooter. Here, the element of identity was proven by direct evidence, that is, the testimony of three eyewitnesses. That the three eyewitnesses might be disbelieved does not make their evidence legally insufficient; that is the province of the jury. The evidence is legally sufficient.

Morris further contends that a neutral review of all of the evidence demonstrates that proof of his guilt is so obviously weak as to be clearly wrong, manifestly unjust, and against the great weight and preponderance of the conflicting evidence. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). Morris points out that the testimony of both Xavier Jones and Anthony Jones is wholly unreliable, given the fact that neither came forward, until long after the fact, with the information they knew of this crime. Further, both have had trouble with the law in the past, and Xavier Jones is a three-time convicted felon who has previously lied to authorities.

Certainly, the testimony of each of the eyewitnesses could be disbelieved in varying degrees; yet, the jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony. Reconciliation of conflicts in the evidence is also within the exclusive province of the jury. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994). The jury may choose to believe some testimony and disbelieve other testimony. *Wyatt*, 34 S.W.3d at 30. Moreover, we afford "almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon*, 253 S.W.3d at 705.

We conclude the evidence was both legally and factually sufficient to support Morris' conviction. Viewing the evidence in the light most favorable to the conviction, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See Laster*, 275 S.W.3d at 517. Neither was the evidence so weak as to render the verdict clearly wrong or

10

manifestly unjust, nor was the jury's verdict against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414–15. Accordingly, Morris' legal and factual sufficiency points of error are overruled.

*(2)*     *Morris' Disproportionate Sentence Claim Was Not Preserved for Our Review*

Morris also claims that the life sentence he received is disproportionate to the offense of murder. It is claimed that the sentence here is "so plainly disproportionate to the offense as to shock the sense of humankind and thus constitute cruel and unusual punishment prohibited by the United States and Texas Constitutions." *See Hyde v. State*, 723 S.W.2d 754 (Tex. App.—Texarkana 1986, no pet.).

To preserve a complaint for appellate review, Morris must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a)(1)(A). This Court has held that a defendant is required to raise a disproportionality objection to a sentence at the time the sentence is imposed or by a timely-filed motion for new trial. *Mullins v. State*, 208 S.W.3d 469, 470 n.1 (Tex. App.—Texarkana 2006, no pet.).

When Morris' sentence was announced and imposed, no objection was made on the basis that the sentence was disproportionate to his crime. In his motion for new trial, it was incumbent on Morris to cite specific legal authority and to provide legal arguments based on that authority. *See Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002). Morris' unsupported and general

11

challenge that the sentence was contrary to the law and the evidence is insufficient to preserve his complaint on appeal, attacking the constitutionality of the sentence.[17]  Additionally, the sentence assessed fell within the range provided for first-degree felony punishments.  We overrule this point of error.

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:     April 26, 2010
Date Decided:       April 27, 2010

Do Not Publish

---

[17]Even if the contention had been preserved for review, the record contains no evidence comparing the sentence imposed here with sentences imposed against defendants in Texas and in other jurisdictions who committed a similar offense.  *See Guin v. State*, 209 S.W.3d 682, 687 (Tex. App.—Texarkana 2006, no pet.).