

# NUMBER 13-09-416-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MICHAEL PEREIDA,                                                                    Appellant,

v.

THE STATE OF TEXAS,                                                                 Appellee.

## On appeal from the 214th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Memorandum Opinion by Justice Vela

A jury convicted appellant, Michael Pereida, of murder, *see* TEX. PENAL CODE ANN.

§ 19.02(b)(1), (2) (Vernon 2003), and aggravated assault with a deadly weapon. *See id*.

§§ 22.01(a)(1), 22.02(a)(2) (Vernon Supp. 2009). The jury assessed punishment at ninety

years' and twenty years' imprisonment, respectively. The sentences were ordered to run

concurrently.  In three issues, appellant challenges the sufficiency of the evidence to support his convictions, and he complains that he was denied a fair and impartial trial.  We affirm.

## I. FACTUAL BACKGROUND

On June 19, 2008, Eva Ybarra received a phone call from Rachel Adame, who told her that Misty Torres, Maricela "Chata" Ybarra, and others "wanted a fight."  Eva went to the corner of 10th and Booty Streets in Corpus Christi where she and Chata started fighting with each other.  After their fight, Rachel and Misty fought each other.  During the fight, Eva saw appellant, whom she knew as "Slow," running toward the passenger side of Misty's vehicle.  Eva stated that appellant took a gun from the vehicle and started shooting. Rachel saw shots fired from the front-passenger side and back-passenger side of Misty's vehicle. Maria Cortez, who was present during the fight, saw appellant shoot her boyfriend, Jose Gomez.  A.S., a child witness who was present at the scene, testified that during the fight he heard gunshots and got shot "[o]n my hip" and that the bullet went out "the back of my leg."  He did not see who shot him, but he testified that he saw two people holding guns.

Justin Sanchez, another witness, testified that he saw two people with guns during the fight and that he saw appellant "in the passenger's seat of [Misty's] vehicle shooting the gun."  Sanchez could not confirm the identity of the person who shot A.S.

Maria Rosales and her daughter, F.T.,[1] had accompanied Eva Ybarra to the fight. Rosales testified that during the fight, appellant "fired a warning shot" into the air.  At trial, the prosecutor asked Rosales, "After the initial warning shot was fired, did you actually see

---

[1]F.T. is a child witness.

any other person shoot?", she said, "The brother," whom she knew as "'Pizzi.'" Rosales also saw another man shooting "[f]rom the vehicle." According to Rosales, appellant got into the front-passenger side of Misty's vehicle. As the vehicle was driving away, shots came from the front-passenger side. When the prosecutor asked F.T., "Who did you see draw out their weapons?", she said, "'Slow' and 'Pizzi'". F.T. identified appellant as the person she knew as "Slow." F.T. saw Pizzi "shooting randomly." When the prosecutor asked F.T., "Do you recall testifying at a previous trial that the person you know as 'Slow' fired four shots and that his brother[2] fired five to six shots?", she said, "Yes, sir."

"Chata" testified that on the day of the shooting, Misty and two of Misty's "'brothers'" arrived at her residence. Chata and her niece, V.A.,[3] got into Misty's vehicle. When Misty picked up a younger, third male, who had a gun, Chata saw that Misty's other two male passengers had guns, too. When Misty stopped at the corner of 10th and Booty Streets, Chata got out and started fighting with Rachel. Chata testified that when Eva arrived at the scene, "I just went after Eva and I started fighting her." At some point, Chata saw "the two guys[4] that were with us run to the vehicle." She did not see either of these two men take out a gun. After she heard gunshots, Chata got into Misty's vehicle and saw the younger man, who Misty had picked up earlier, take his gun out and fire it. Chata also saw Misty's front-seat passenger, whom she identified as appellant, pull out a gun, but she did not see him fire it. Misty drove to Morgan and Crosstown where the guns were thrown out of the vehicle.

---

[2]Appellant's brother's name is Mark Pereida.

[3]V.A. is a child witness.

[4]Chata testified that neither of these two men was the younger, third male who Misty picked up on the way to 10th and Booty Streets.

3

V.A. testified that on June 19, 2008, she, Chata, Misty, and three men went in Misty's vehicle to 10th and Booty Streets to see a fight between Chata and Eva. V.A. stated that "[w]hen we were leaving" after the fight, two of the men inside Misty's vehicle, one of whom she knew as "Jose" and the other whom she identified as appellant, fired their weapons "out the windows." Misty drove to a McDonald's restaurant near the freeway. There, everybody except Misty got out of the vehicle. When the prosecutor asked V.A., "Prior to the guys getting out of the vehicle, did you see anybody get rid of anything?", she said, "They threw the guns in the grass." On cross-examination, V.A. testified that "there were three guns thrown out by three guys."

After the shooting, Diego Rivera, a crime-scene technician, recovered four .25 caliber shell casings from the scene. He found a bullet hole in the wall of an apartment near the corner of 10th and Booty Streets, and he recovered a bullet fragment from inside that apartment.

Caroline Martinez, a firearms examiner, testified that the bullet fragment recovered from the apartment was from a .38 caliber bullet fired from a revolver, which would not dispense a shell casing. She also opined that a .25 caliber shell casing recovered from Misty's vehicle matched the four casings recovered from the crime scene. All of these casings were fired from the same .25 caliber firearm. A .25 caliber bullet was recovered from the body of Jose Gomez; however, Martinez could not determine whether the bullet removed from Gomez's body came from the same gun that fired the five .25 caliber shell casings.

4

Officer Jason Smith obtained a videotaped statement[5] from appellant in which appellant said that when he was leaving 10th and Booty Streets, he was sitting in the driver's seat, Misty was in the front-passenger seat, Wii-Man[6] and Pizzi were in the second row of seats, and V.A. and Chata were in the third row of seats. Officer Smith testified that Jessica Amador told him that appellant was sitting in the driver's seat when Misty's vehicle left the scene. In his video-taped interview, appellant stated that Wii-Man was the only shooter.

Dr. Ray Fernandez, the Nueces County Medical Examiner, performed Gomez's autopsy and testified that "[t]he cause of death was a gunshot wound to the chest." He recovered the bullet from between the tenth and eleventh rib.

## II. DISCUSSION

### A. Sufficiency of the Evidence

We first address issues two and three together. In issue two, appellant contends the evidence is insufficient to sustain his convictions because the circumstantial evidence only established his presence at the crime scene. In issue three, he contends the evidence is insufficient to show that the offenses were committed intentionally.

#### 1. Standards of Review

"'In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'"

---

[5]During the guilt-innocence phase, the State introduced a recording of this interview into evidence as State's exhibit 6 and played it to the jury.

[6]The evidence showed that "Wii-Man" is the nickname for co-defendant Jose Cardenas.

*Roberts v. State*, 273 S.W.3d 322, 326 (Tex. Crim. App. 2008) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). In a factual-sufficiency review, the only question to be answered is: "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Evidence can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support the fact finder's verdict"; or (2) "considering conflicting evidence, the fact finder's verdict is 'against the great weight and preponderance of the evidence.'" *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual-sufficiency review, it must defer to the jury's findings. *Id*. The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.3d at 414). First, the appellate court must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict. *Id*. Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. *Id*. Although the verdict is afforded less deference during a factual-sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*.

### 2. Applicable Law

Our review of a legal and factual sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti*, 273 S.W.3d at 280-81. "'Such a charge [is] one that accurately sets out the law, is authorized by the

indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits the offense of murder if he or she intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury or commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person commits the offense of assault if that person intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens another with imminent bodily injury. *Id*. § 22.01(a)(1), (2). The offense becomes aggravated assault if the person committing the assault uses a deadly weapon during the commission of the offense. *Id*. § 22.02(a)(2).

A person acts intentionally when it is his or her conscious desire to cause the result of his or her conduct. *Id*. § 6.03(a) (Vernon 2003). A person acts knowingly when he or she is aware that his or her conduct is reasonably certain to cause the result. *Id*. § 6.03(b). A person's knowledge and intent may be inferred from the "acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

A person is criminally culpable as a party if, with intent to promote or assist the commission of the offense, the person solicits, encourages, aids, directs, or attempts to aid, another person in commission of the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003). In reviewing the sufficiency of the evidence to support a defendant's participation as a party, "we may consider 'events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *King v. State*, 29 S.W.3d

7

556, 564 (Tex. Crim. App. 2000) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)).

### 3. Analysis of Sufficiency Challenges

A rational jury could have determined the following from the evidence: (1) appellant went with two other men to a fight; (2) appellant and the two other men brought guns to the fight; (3) after the fight, appellant and one of the other men fired their guns; (4) during the shooting, appellant shot and killed Gomez and A.S. was shot in the hip; (5) the four .25 caliber shell casings recovered from the scene and the .25 caliber shell casing recovered from Misty's vehicle were fired from the same weapon; and (6) Gomez was killed by a .25 caliber bullet. Furthermore, the evidence showed that appellant fled the scene after the shooting. A fact finder may draw an inference of guilt from the circumstance of flight from the crime scene. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007). In addition, appellant's attempt to conceal his weapon by throwing it in the grass is probative of wrongful conduct and is also a circumstance of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2007) (stating that "[a]ttempts to conceal incriminating evidence, are probative of wrongful conduct and are also circumstances of guilt").

Controverting evidence showed that: (1) appellant gave a statement to the police in which he told them that when Misty's vehicle left 10th and Booty streets, he was seated in the driver's seat and that Wii-Man was the only shooter; (2) no weapons were recovered; (3) there was no physical evidence linking appellant to either Gomez's murder or the aggravated assault of A.S.; and (4) appellant's fingerprints were not found on any of the shell casings. Even though appellant told police that Wii-Man was the only shooter, the jury apparently chose to believe the witnesses' testimony identifying appellant as one of the shooters. The jury is the exclusive judge of the facts proved and of the weight given

8

to the testimony. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979). Therefore, the jurors were free to accept or reject any or all of the witnesses' testimony. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)); *see also Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) (stating "[t]he jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record"). By convicting appellant, the jury obviously chose to accept the testimony offered by the State and reject the testimony favorable to appellant. We must defer to the jury's determination. *See Clayton*, 235 S.W.3d at 778 (stating that "[w]hen the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination"). Even though the witnesses testified to different versions of the events surrounding the shooting of both Gomez and A.S., a jury is free to accept one version of the facts and to reject another or to reject any part of a witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). Furthermore, a verdict is not manifestly unjust merely because the jury resolved any conflicting views of the evidence in the State's favor. *See Cain*, 958 S.W.2d at 408-09.

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty as a party or a principal to Gomez's murder and to the aggravated assault of A.S. beyond a reasonable doubt. After reviewing all of the evidence in a neutral light, we conclude that the evidence supporting the convictions is not so weak that the fact-finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. We conclude that the evidence is legally and factually

sufficient to support the convictions.  Issues two and three are overruled.

## B. Appellant's Right to a Fair Trial

In issue one, appellant contends the State denied him a fair and impartial trial because the Corpus Christi Police Department (CCPD) failed to gather and process evidence that was material and relevant to his defense.

The facts showed that the shooting occurred about 3:55 p.m. on June 19, 2008. That day, between 6:00 p.m. and 6:30 p.m., appellant arrived at CCPD where Officer Jason Smith requested that a gunshot residue (GSR) test be performed on appellant's hands.  He did not confiscate appellant's clothes and did not request that a GSR test be performed on appellant's clothing.  At 9:30 that evening, a CCPD crime-scene technician conducted the GSR test on appellant's hands and sent the test samples to a DPS lab for analysis.  However, Caroline Martinez, a CCPD firearms examiner, testified that DPS did not analyze these samples because "[i]t's the policy of the Department of Public Safety lab not to do analysis after four hours from the time of the shooting to the time of collection. . . ."  She testified that because more than four hours had elapsed from the time of the shooting to the time the GSR test was conducted, DPS did not analyze the samples.

Appellant argues that had his clothes been tested for the existence of nitrate particles, he "might not have even been charged with this crime."  Furthermore, he argues that he was denied a fair trial because CCPD was "either not aware or [was] totally derelict in [its] duties to administer the GSR test within the time limits prescribed by the DPS lab."[7]

---

[7]Appellant has not cited any authority requiring law enforcement to conduct a gunshot-residue test on a person to determine whether he or she was the person who had fired a gun.  In *Munoz v. State*, No. 13-08-00239-CR, 2009 WL 695462, at *11 (Tex. App.–Corpus Christi Jan. 15, 2009, pet. ref'd) (mem. op., not designated for publication), the defendant argued on appeal that "law enforcement was required to conduct gun residue tests on him to determine if it was he who fired the gun that night."  *Id*.  We stated that the defendant "has not cited to, nor are we aware of, any authority requiring law enforcement to conduct a gun residue test to prove that a defendant has committed an aggravated assault."  *Id*.

10

To preserve error, a defendant must make a timely and specific objection as soon as the basis for the objection becomes apparent, and the complaint on appeal must comport with the trial objection. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). Even constitutional issues can be waived if they are not brought to the trial court's attention. *See Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000). In this case, appellant did not object to the failure to timely conduct the GSR test on his hands or to conduct any GSR test on his clothing. We conclude appellant did not preserve his complaint for appellate review. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).[8] Issue one is overruled.

## III. CONCLUSION

We affirm the trial court's judgment of conviction for both offenses.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
29th day of July, 2010.

---

[8]*See also Rodriguez v. State*, No. 13-07-00494-CR, 2009 WL 2914257, at *4-5 (Tex. App.–Corpus Christi, Aug. 31, 2009, no pet.) (mem. op., not designated for publication).

11