**Opinion filed February 14, 2019**



## In The

# Eleventh Court of Appeals

_____

## No. 11-17-00025-CR

_____

## JEKARIS LEE BRYANT, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR24860**

### MEMORANDUM OPINION

Jekaris Lee Bryant appeals his conviction for the capital murder of B.A.B., his 28-day-old daughter. After a bench trial, the trial court found Appellant guilty and sentenced him to life imprisonment without the possibility of parole. In this regard, the State did not seek the death penalty. In a single issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. We affirm.

### Background Facts

B.A.B. was the 28-day-old daughter of Appellant and Makahla Brewer. On December 13, 2015, Brewer went to Walmart with her friend, Jordon Brown, to get

premade formula for B.A.B.  B.A.B. had finished drinking a bottle of formula and was sleeping downstairs.  Earlier that day, Brown had taken a picture of B.A.B., which showed B.A.B. with her eyes open.  She was swaddled in a blanket and wearing a onesie.  Before leaving, Brewer told Appellant, who was preparing to take a shower, to take B.A.B. upstairs and look after her while they were gone.  Brewer testified that B.A.B. appeared to be doing well and that there was no cause for concern when Appellant took her upstairs.  Appellant was alone with the baby for approximately thirty minutes.

Brewer testified that, when she and Brown returned, Appellant was finishing up in the shower.  Brewer asked Appellant to bring B.A.B. downstairs when he was done.  When Appellant brought B.A.B. downstairs, she was still swaddled in a blanket, but she was no longer wearing the onesie.  He made no comment about the baby and placed her in the swing near the couch.  Brewer and Brown were sitting at the kitchen table.  A few minutes later, someone commented that B.A.B. looked pale.[1]  Brewer then went to go check on B.A.B. and found her unresponsive.  When Brewer pulled down B.A.B.'s blanket, she noticed bruising around her collar bone.  She also realized that the baby was not moving or breathing.

Brewer immediately picked up B.A.B., grabbed the keys, and ran to the car.  Appellant and Brown ran behind Brewer, and together they rushed to the hospital.  In the car, Brewer told Appellant to start CPR and Brown called 9-1-1.  Appellant used two fingers to press lightly on B.A.B.'s chest—not wanting to hurt the baby—and started to breathe into her mouth.  The trip to the hospital took approximately three to five minutes.  When they arrived, hospital staff were waiting.  Dr. Stephen Nichols and Dr. Scot Morris tried to save B.A.B.  But after forty-two minutes of lifesaving efforts, they were unable to revive the baby.

---

[1]The parties are in disagreement as to who made the comment that B.A.B. looked pale. Nonetheless, the comment compelled Brewer to check on B.A.B.

Dr. Nichols was the emergency room physician in charge of B.A.B.'s care. He testified that, when B.A.B. arrived, "[s]he was basically dead." B.A.B. was "completely unresponsive," with no reflexes, heartbeat, breathing, or electrical activity. Dr. Nichols further testified that B.A.B.'s pupils were "fixed and dilated," meaning that she was likely dead for some time, possibly over thirty minutes, and that her body temperature was well below normal at 91.4 degrees. B.A.B. already had lividity marks on her body. Dr. Nichols also noticed that B.A.B. had dark bruising, about an inch in diameter, bilaterally across her upper chest. He explained that such bruising on an infant was suspicious.

Given the suspicious manner in which B.A.B. died, Dr. Tasha Greenberg, a Tarrant County medical examiner, conducted an autopsy of B.A.B. Dr. Greenberg testified that the autopsy revealed multiple bilateral posterior, anterior, and anterior lateral rib fractures. The autopsy further revealed that B.A.B. suffered the following injuries: contusions of the upper chest; focal hemorrhage of the posterior neck muscle; scant subdural hemorrhage of the brain and spinal cord; patchy subarachnoid hemorrhage of the brain; subdural hemorrhage of optic nerves; bilateral retinal hemorrhages; and hemorrhage of cervical spinal nerves. Dr. Greenberg noted that the hemorrhage of B.A.B.'s spine existed at all levels from the base of her skull to the lower cervical spine. She also noted two contusions under the right and left side of B.A.B.'s chin. These injuries, she explained, were consistent with some sort of rotational force, such as squeezing and shaking. Given the location of the bruises, Dr. Greenberg testified that they could have resulted from someone gripping and shaking B.A.B. with his hands under her armpits and his thumbs on her chest.

Dr. Dana Elizabeth Austin, an anthropologist who examined B.A.B.'s skeletal remains, testified that B.A.B.'s rib fractures were of particular concern. She determined that B.A.B. had at least twenty-eight rib fractures. She noted that the

ribs at the top of the rib cage are the strongest and that B.A.B.'s bones in general had a strong elastic component given her young age. Dr. Austin explained that, because most of B.A.B.'s ribs were completely fractured from top to bottom, down the rib cage in a column, strong and excessive force would have been required to cause the fractures. She also explained that these injuries were likely caused by someone holding B.A.B. and squeezing her ribs with the thumbs, while having her back anchored with the fingers.

Dr. Morris, a pediatrician with over fifteen years of experience, also treated B.A.B. in the emergency room. According to Dr. Morris, given the multitude of injuries that B.A.B. sustained, including the rib fractures and internal hemorrhaging, B.A.B. "was shook violently for a sustained amount of time." Dr. Morris testified that he would expect that "someone squeezed most of the infant's chest with great force and shook violently to cause this many fractures in this many positions." He characterized the level of force required to inflict such injuries as "severe acceleration/deceleration," consistent with "falling three stories over and over again." Dr. Morris further opined that "any person would know that the . . . trauma required to cause these injuries would be life-threatening." Ultimately, Dr. Morris concluded that such injuries were the result of non-accidental trauma and "violent sustained shaking."

In addition, Dr. James Claude Upshaw Downs, an experienced forensic pathologist, testified about the severity of B.A.B.'s injuries. Dr. Downs explained that the retinal hemorrhages extended all the way to the front of the retina. In particular, he noted that the bleeding in the left eye was significant because there were "dark spots throughout the retina," which originated all the way from the back of the eye to the front of the retina. Given the extent of these injuries, Dr. Downs testified that such injuries were caused by "extreme force," such as "violent acceleration/deceleration." He further testified that the hemorrhaging of the nerve

4

roots of the spinal cord in B.A.B.'s neck, which had bleeding at every level, strongly suggested that someone shook B.A.B. Dr. Downs also testified that B.A.B. had thirty-two total rib fractures. Like Dr. Morris, Dr. Downs concluded that B.A.B.'s broken ribs were caused by "squeezing combined with shaking." Although he could not quantify the amount of force needed to produce B.A.B.'s injuries, he explained that "significant force . . . over a protracted period of time" was required to cause them.

Appellant did not appear to show much emotion at the hospital while doctors tried to revive B.A.B. Officer Gary Villapando, a police officer with the Brownwood Police Department who came to the hospital, described Appellant as the "least emotional" person in the family. In contrast, he testified that Brewer was "extremely upset" and "screaming as if she was in pain or some kind of agony."

Dr. Pennissi Locker Patrick Taylor, Appellant's expert witness, testified that Appellant had a low IQ of 73 and had limited cognitive and problem-solving abilities. But Dr. Taylor also admitted that Appellant was not intellectually deficient, that he recognized the need to be careful with babies, and that he had the capacity to understand the difference between right and wrong.

At the hospital, Appellant spoke with Dr. Morris, Dr. Nichols, and Officer Villapando about what had happened to B.A.B. Appellant explained to Officer Villapando that he brought B.A.B. downstairs, fed her, and laid her down in her swing to sleep. Then while he, Brewer, and Brown were watching a movie, Appellant claimed that he was the first to notice the discoloring on B.A.B.'s chest. According to Appellant, when he went to check on B.A.B., he noticed that she was cold and limp. Appellant picked her up and did not hear a heartbeat. Appellant also spoke to the doctors about when B.A.B. was last fed. Appellant told Dr. Morris that B.A.B. was well-fed probably two hours before he found her nonresponsive. After speaking with Dr. Morris, however, Appellant told Dr. Nichols that he had bottle-

5

fed B.A.B. only five minutes before he found her cold, bruised, and limp in her swing.

After talking with Appellant, Officer Villapando spoke with Brown. Officer Villapando testified that Brown's recollection was different than Appellant's. In particular, Officer Villapando testified that Brown told him it was actually Brewer who first noticed something was wrong with the baby. Additionally, Brown expressed that Brewer was the one who picked up B.A.B. and that Brewer— not Appellant—checked for signs of life.

Later that day, with Appellant's consent, Detective Harold Q. Thomas conducted an in-home investigation of Appellant's apartment to determine what had happened. During this investigation, Appellant failed to disclose to Detective Thomas that he was home alone with B.A.B. Appellant also continued to maintain that he fed B.A.B. and put her in the swing, before he found her cold and nonresponsive. This time, he claimed that Brown was the first to notice that B.A.B. looked pale. But he also told Detective Thomas that he was the first to check on B.A.B. and notice purple bruising on B.A.B.'s chest.

In a subsequent interview with Detective Thomas conducted four days later, Appellant stated that he (not Brown) was the one who asked whether B.A.B. looked pale. Appellant admitted that Brewer, rather than Appellant, was the one who first checked on B.A.B. After further questions, Appellant also disclosed to Detective Thomas for the first time that he was home alone with B.A.B. while Brewer and Brown went to Walmart. Appellant, however, repeatedly emphasized that, when he was home alone with B.A.B., he was in the shower the entire time. Further, Appellant told Detective Thomas that he administered CPR to B.A.B. during the car ride to the hospital, by lightly pushing on her chest with two fingers "but not too hard." Detective Thomas testified that Appellant's description of how he performed CPR indicated that he did not use excessive force. But when

6

Detective Thomas questioned him about B.A.B.'s unusual bruising and injuries, Appellant then professed that he may have pushed harder than he thought.

A few weeks later, and two days before Appellant was arrested, he participated in another interview with Texas Ranger Jason Shea. During this interview, Appellant repeatedly denied that he fed B.A.B. on the day she died. He denied telling the doctors that he fed B.A.B. five minutes before finding her nonresponsive. He also denied that B.A.B. choked and claimed that he did not remove the onesie B.A.B. was wearing that day. Ranger Shea testified that Appellant's body language indicated that he was being dishonest and that Appellant attempted to blame Brown for what happened to B.A.B.

After Ranger Shea suggested that B.A.B.'s death may have been the result of an accident, Appellant confessed that he did feed B.A.B. that day and that B.A.B. died after she choked on the formula. Appellant claimed that he tried to help B.A.B. by patting her on the back, and even stood up and shook her a little, but nothing worked. He claimed that B.A.B. then suddenly stopped moving in his arms and closed her eyes. Appellant also admitted that he took off B.A.B.'s onesie because it was covered in her vomit.[2]

Both Dr. Nichols and Dr. Morris testified that B.A.B. could not have died from choking on milk or formula because there were no signs of milk or formula in B.A.B.'s airways and nasal passages. They also testified that it was not likely that Appellant fed B.A.B. five minutes before finding her nonresponsive because B.A.B.'s low body temperature and the signs of lividity on her body suggested that

_____

[2]Appellant told Ranger Shea that, after B.A.B. vomited on her onesie, he took it off, went downstairs, and placed it next to the microwave. Brewer testified that she located the onesie near the microwave and that the onesie smelled like vomit. Brewer took the onesie and put it in Appellant's father's truck, and Appellant's brother's girlfriend later took it and washed it. Thus the onesie was never collected as evidence. Appellant did not mention the onesie or disclose its location to Detective Thomas during his in-home walk-through of Appellant's apartment.

she could not have been fed only a few minutes before arriving at the hospital. Appellant's medical expert, Dr. Kris Lee Sperry, agreed that B.A.B.'s death was not the result of choking. Rather, he likewise concluded that B.A.B. died as a result of "rapid squeezing" of her chest accompanied by "shaking to whatever extent was necessary to result in the injuries." In addition, Dr. Nichols emphasized that B.A.B.'s injuries could not have been caused by any resuscitative efforts utilized by hospital personnel or performed by Appellant himself.

Appellant was arrested on January 22, 2016, and charged with capital murder. The indictment alleged that Appellant knowingly caused the death of B.A.B., who was younger than ten, by shaking, squeezing, or striking or by manner and means unknown. While in jail, Appellant had several phone conversations with his family. In one conversation, he confirmed that he was alone with B.A.B. the entire time Brewer and Brown went to Walmart. In another conversation, when Appellant's brother asked him whether he admitted that he "did that," Appellant answered, "Yep." After a four-day bench trial, the trial court found Appellant guilty of capital murder.

*Analysis*

In his sole issue on appeal, Appellant contends that the evidence was insufficient to support his capital murder conviction. Appellant directs his sufficiency challenge to the *mens rea* required for the offense of capital murder. Specifically, Appellant argues that the evidence was insufficient to support the finding that he knowingly caused the death of B.A.B. In making this assertion, Appellant places an emphasis on a comment made by the trial court when it announced its verdict at the end of the guilt/innocence phase. The trial court noted that there was no allegation that Appellant intentionally murdered the infant and that there was no evidence that Appellant intentionally murdered the infant. Appellant asserts that there is "little difference" between the culpable mental states of

intentionally and knowingly. Appellant argues that it was irrational for the trial court to find beyond a reasonable doubt that he knowingly committed the offense because the trial court found no evidence that he intentionally murdered B.A.B. We disagree.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

A person commits capital murder if the person intentionally or knowingly causes the death of an individual under ten years of age. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011), § 19.03(a)(8) (West Supp. 2018). Capital murder and murder are result-of-conduct offenses, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death. *Roberts v. State*,

9

273 S.W.3d 322, 328–29 (Tex. Crim. App. 2008); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (citing *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994)).

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. PENAL § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The indictment in this case only alleged that Appellant knowingly caused B.A.B.'s death. Thus, the State was required to prove that Appellant was aware that his conduct was reasonably certain to cause the baby's death. *See Chaney v. State*, 314 S.W.3d 561 (Tex. App.—Amarillo 2010, pet. ref'd).

We disagree with Appellant's contention that the culpable mental states of "intentionally" and "knowingly" are virtually synonymous. "Knowingly" is a lesser-included culpable mental state of "intentionally." *See Hicks v. State*, 372 S.W.3d 649, 656 (Tex. Crim. App. 2012). Furthermore, these culpable mental states have different elements. As noted in *Roberts*, "[c]apital murder is a result-of-conduct oriented offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e.[,] the death of the named decedent." 273 S.W.3d at 329. A person intentionally commits murder if it is his objective to produce the death of the named decedent; a person knowingly commits murder if he has a substantial certainty of producing the death of the named decedent. *See id.*

As applied to Appellant, the State could establish his guilt for capital murder by proving that he was aware that his conduct was reasonably certain to cause the baby's death even though he did not intend to cause the baby's death. *See* PENAL § 6.03(b). Thus, if the evidence is sufficient, a defendant may be convicted of capital murder if he acted "knowingly," even though the evidence is insufficient to show

10

that he acted "intentionally." *See Darnes v. State*, 118 S.W.3d 916, 920–21 (Tex. App.—Amarillo 2003, pet. ref'd) (discussing that evidence tending to illustrate that defendant did not intentionally cause the death of the eleven-month-old child did not preclude a finding that he knowingly caused the child's death). Thus, "merely disproving that he may have acted 'intentionally' does not *ipso facto* insulate the actor from being found guilty for capital murder if he nonetheless was charged with acting, and the State proved he acted with, a knowing state of mind." *Id.* at 920.

"Proof of a culpable mental state almost invariably depends upon circumstantial evidence." *Montgomery v. State*, 198 S.W.3d 67, 87 (Tex. App.—Fort Worth 2006, pet. ref'd); *Morales v. State*, 828 S.W.2d 261, 263 (Tex. App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993). A factfinder can infer knowledge from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Additionally, the factfinder can infer a culpable mental state from the acts, words, and conduct of the accused. *Id.* In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id.* The Court of Criminal Appeals has stated that "[a]ny violent assault on such a young child may be reasonably expected to cause death." *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973).

The evidence in this case shows that B.A.B. was alive and healthy, displaying no cause for concern except a diaper rash, before Brewer and Brown went to Walmart. Appellant was alone with B.A.B. for approximately thirty minutes. After Brewer and Brown returned, B.A.B. was cold, limp, and not breathing. B.A.B. also had dark bruising bilaterally across her chest. Doctors pronounced B.A.B. dead after she did not respond to lifesaving efforts. B.A.B. was only twenty-eight days old

11

when she died; she weighed a little less than ten pounds. In contrast, Appellant was an 18-year-old male who was 5′9″ and weighed 175 pounds.

Dr. Greenberg conducted an autopsy of B.A.B. The autopsy revealed numerous, serious injuries, including extensive hemorrhaging in B.A.B.'s eyes, brain, neck, and spine. B.A.B. also had thirty-two total rib fractures. The fractures were present throughout the top and bottom, as well as the front and back, of the rib cage. Several doctors testified at trial. Collectively, their testimony established that strong rotational force, accompanied by shaking and squeezing for an extended period of time, caused B.A.B.'s injuries. In particular, Dr. Morris testified that B.A.B.'s injuries were consistent with someone grabbing B.A.B. by the chest and shaking forcefully. The testimony at trial also established that B.A.B.'s injuries were not caused by a choking event, given the lack of any milk or formula in her airways, or any resuscitative efforts, either by medical personnel or Appellant himself. Instead, the extent and severity of the injuries caused the doctors to conclude that B.A.B.'s death resulted from non-accidental trauma.

At the hospital, Appellant did not appear very emotional. More importantly, he was not completely forthcoming and truthful to medical personnel or law enforcement. He provided inconsistent statements to Dr. Nichols and Dr. Morris about when B.A.B. was last fed. Further, during the investigation of B.A.B.'s death, Appellant attempted to conceal his involvement. In particular, he failed to disclose key facts to law enforcement, including the fact that he was alone with B.A.B. for approximately thirty minutes; that he was not in the shower the entire time he was alone with the baby; and that, after B.A.B. allegedly choked, he took off B.A.B.'s onesie, on which she had vomited.

In addition, Appellant made conflicting statements about the events leading up to finding B.A.B. unresponsive in her swing, including whether he fed B.A.B., whether she choked, and who first noticed B.A.B. was pale and went to go check on

12

her.  Appellant even attempted to shift the blame to Brown.  Although he eventually claimed that B.A.B. died because she choked to death, he did so several weeks after the incident and only after Ranger Shea suggested that B.A.B.'s death may have been an accident.  However, the treating physicians and medical experts at trial all concluded that B.A.B. did not die from choking.  Instead, they testified that B.A.B. died due to violent shaking and squeezing.

Considering the severity of B.A.B.'s injuries, the disparity of size and strength between Appellant and B.A.B., the universal knowledge of the fragility of newborn infants, and Appellant's subsequent behavior, a rational trier of fact could have found beyond a reasonable doubt that Appellant knowingly caused the death of B.A.B.  Accordingly, the evidence was sufficient to support Appellant's conviction for capital murder.  We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

February 14, 2019

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Willson, J., and Wright, S.C.J.[3]

Willson, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.